### GENERAL MOTORS CORPORATION *v.* ROY J. PISKOR

[No. 397, September Term, 1974.]

*Decided June 25, 1975.*

96

The cause was argued on December 2, 1974, and reargued on April 8, 1975, before ORTH, C. J., and MORTON and THOMPSON, JJ.

Argued and reargued by *Francis B. Burch, Jr.*, with whom

were *Joseph G. Finnerty, Jr.*, and *Edward S. Digges, Jr.*, on the brief, for appellant.

Argued and reargued by *Leo A. Hughes, Jr.*, with whom were *Ronald L. Lapides, Robert W. Fox* and *Steen, Hughes & Seigel* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

On 30 April 1974 a jury in the Superior Court of Baltimore City decided that General Motors Corporation had violated the personal security of Roy J Piskor by the commission of three tortious acts. It found that General Motors had slandered Piskor, had assaulted him, and had falsely imprisoned him. It awarded Piskor compensatory damages of $1000 for the slander, $300 for the assault, and $200 for the false imprisonment. It assessed punitive damages of $25,000. From judgment on verdict absolute entered on 8 May, General Motors appealed.[1]

---

1. Piskor instituted the action by filing a declaration on 28 December 1970 against General Motors, Kirk L. McGonizal and Guard Nicely. The declaration was amended upon petition and order on 17 December 1971, so that the names of the two natural defendants read William T. McGonigle and Claude L. Nicely. On 15 October 1973 the case came on for trial, and the declaration was again amended in open court by agreement of counsel. Evidence was adduced and the case went to the jury. On 17 October a juror was withdrawn and the jury discharged because they could not agree on a verdict.

On 29 October General Motors moved that the second amended declaration not be received. The motion was denied on 9 April 1974. The declaration as secondly amended alleged assault in the first count, false imprisonment in the second count, and slander in the third count. On 18 April General Motors pleaded the general issue as to each count and also entered a special plea that its actions were qualifiedly privileged as to each of counts two and three. On 23 April Piskor dismissed the case against McGonigle and Nicely without prejudice to his rights.

The case went to trial on 29 April. General Motors' motion for a directed verdict was reserved at the close of evidence offered by Piskor and was also reserved when reoffered at the close of all the evidence. Maryland Rule 552 c. The case was submitted to the jury on 30 April on issues stated. The jury were asked whether they found that Piskor was 1) assaulted, 2) falsely imprisoned, 3) slandered. As to each in which the answer was "yes", they were asked in what amount they found compensatory damages. In the event the answer was "yes" to any one or more, they were asked in what amount they assessed punitive or exemplary damages. As we have set out, the jury found that Piskor had been assaulted, falsely imprisoned, and slandered, and awarded damages as indicated. General Motors' motion for judgment *n.o.v.*, or in the alternative for a new trial, was denied on 8 May, and judgment on verdict absolute was entered the same day. General Motors noted an appeal therefrom on 15 May.

## DEFAMATION AND CONSTITUTIONAL PRIVILEGE

When the appeal was originally briefed and argued no reference was made to recent decisions of the Supreme Court of the United States which brought defamation within the scope of the First Amendment guarantee of freedom of speech and press, applicable to the states through the Fourteenth Amendment.[2] Because we were concerned with the impact of those decisions on the prevailing law of defamation in Maryland, we ordered the appeal and the appeal in the case of *Sindorf v. Jacron Sales Co., Inc.*, which had also been briefed and argued with no reference to the Supreme Court defamation cases, reargued in the light of those decisions. The case which was the prime reason for our action was *Gertz v. Welch, Inc.*, 418 U. S. 323, decided 25 June 1974. *Gertz* was one of the progeny of *New York Times Co. v. Sullivan,* 376 U. S. 254, decided 9 March 1964. It was *New York Times* and its numerous offspring decided before *Gertz* which measured state law, both civil and criminal, with respect to libel, slander and privacy, by constitutional standards, impressing on it the First Amendment guarantees of free speech and press. They did so in such a way as to grant immunity from punishment by way of damages, imprisonment, fine or otherwise to publishers of statements concerning the official conduct of public officials and concerning matters of public interest related to public figures. See *A. S. Abell Co. v. Barnes, supra,* at 59-60. *Gertz* dealt with the defamation of a private individual as

---

2. "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." Amendment I, Constitution of the United States.

It was observed in A. S. Abell Co. v. Barnes, 258 Md. 56, footnote 1 at 59:

"Of course it had long been firmly established that the freedoms secured by the first amendment to the Constitution of the United States against abridgment by the United States are similarly secured to all persons by the fourteenth amendment against abridgment by a state. See *Stromberg v. State of California,* 283 U. S. 359, 368-369 (1931). But defamation had generally been considered to be outside the scope of the first amendment. See, for example, *Beauharnais v. State of Illinois,* 343 U. S. 250 (1952). This appeared to be accepted even by advocates of the 'absolutist' interpretation of the amendment. See Meiklejohn, *The First Amendment is an Absolute,* 1961 Sup. Ct. Rev. 245, 258. . . ."

distinguished from a public official or public figure, and apparently its holdings drastically affected state law in that area. We decided *Sindorf*, using it to analyze *Gertz*. *Sindorf v. Jacron Sales Co., Inc.*, 27 Md. App. 53. In our reading of *Gertz* we saw three paths which could be followed in applying its holdings: (1) they applied to all defamations; (2) they applied only to defamations involving matters of public or general interest, thus excluding purely private defamations; and (3) they applied only to defamations in which the media were the means of the defamatory injury. We avoided the first path because we believed that it was not constitutionally required that we follow it. Its route led to a scuttling of much of the prevailing defamation law of Maryland as to matters which were of no concern to the First Amendment freedoms of speech and press. We chose the second path and rejected the third for reasons fully set out in *Sindorf*. Following the second path, we were led to these conclusions:

> (1) The *New York Times* standard defining the level of constitutional protection appropriate to the context of a public person was reaffirmed. Public officials and public figures may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with "actual malice", that is, with knowledge of its falsity or with reckless disregard for the truth.

> (2) When a defamatory statement, whether published by the media or not, concerns a matter of public or general interest:

>> a) except for imposing liability without fault, a State may define the appropriate standard of liability for injury to a private individual by a defamatory falsehood, or in other words, short of strict liability, the *New York Times* standard is not constitutionally required with respect to defamatory falsehood injurious to a private individual;

b) a State may not permit recovery of presumed or punitive damages when liability is not based on proof of knowledge of falsity or reckless disregard for the truth, that is, presumed or punitive damages may be recovered only upon a showing of "actual malice" in the constitutional sense.

(3) A purely private defamation — when a private individual is injured by a defamatory falsehood which is not a matter of public or general interest — is not within the ambit of the First Amendment and the relevant State law prevails, the *Gertz* holdings not being impressed thereon.

## FACTS

What happened between Piskor and General Motors which led to the action reviewed by us is gleaned from the evidence adduced at the trial. We give a compendium of it.

At the General Motors automobile assembly plant in Baltimore, members of its security detail manned a checkpoint at the change of a shift to assure that only authorized personnel entered the plant and that employees leaving the plant were not stealing their employer's goods. There were stairs leading from the work floor to a landing or "platform" and stairs from the landing to the ingress and egress doors of the plant. The checkpoint was on the landing, which was immediately adjacent to the security detail's office, referred to as the "guard office." The stairs leading from the work floor to the landing were near the Hard Trim assembly line, and also close by the clocks which were "punched" by employees to register the time they arrived for and departed from work. The Console Assembly line was located at a point more distant from the stairs than the Hard Trim line. It was on the Console line that vehicle components generally described as the "dashboard" were stored and assembled. These components included relatively small but

valuable parts such as radios, tape players and tachometers. Security was a constant problem on this line, and there had been a number of thefts of such items.

Piskor, 19 years of age and unmarried, had been employed by General Motors for about a year and a half. He worked on the Hard Trim line on the shift which ended at 4:00 p.m. William Bullock worked the same shift on the Console line. He installed radios and had a number of them stacked at his job site. On 30 December 1969, about 3:40 p.m., Piskor went from the Hard Trim line to the Console line and talked for a few minutes with Bullock about a ride home. About 5 minutes before the shift ended Piskor returned to the Console line and again conversed with Bullock for a short time. When the whistle blew for the shift change, Piskor undertook to leave the plant.

Colby West was the foreman of the Console line. West did not know Piskor personally, but had seen him with Bullock several times in the past. West saw Piskor talk to Bullock each time on 30 December. The first time Piskor was dressed in "regular work clothes", but the second time he had on an "Army fatigue jacket", a loose fitting outer garment with a zipper closure from bottom to the collar. It had two large "kangaroo pockets" in front. The jacket was zipped up to the neck. Piskor talked to Bullock for a few minutes and left the area. When he left he had his hands in the front pockets of the jacket and he "seemed to be in a stooped or hunched fashion with his hands pushed forward in the front of his jacket." This aroused West's suspicion.[3] He telephoned the security guard's office and talked to Claude L. Nicely, the sergeant in charge of the detail at the checkpoint. He told

---

3. At the trial West was asked to demonstrate to the jury what he was describing. He said: "My pockets aren't that far to the front. Okay. He, as he walked away he may have been stooped something like this with his hands pushed tightly to the bottom to make his coat look like it was sticking out from his stomach, and Roy is kind of a thin fellow. Anyway, anyhow, the coat was a little big, so that's what I observed."

Bullock, called by Piskor, testified with reference to West: "It was a natural thing for him to start watching anybody walking around my operation because at that time a lot of radios and tapes were being missed in the plant, so naturally just assumed that this is my assumption that they figured the man had something on him."

Nicely what he had observed and described Piskor. Nicely stationed his detail on the landing as he usually did at the end of a shift.

To leave the plant, Piskor had to go back through the Hard Trim line area and then to the time clock for his card. He punched out and started up the stairs to the landing by the guard office.

Nicely saw a man answering Piskor's description approach the time clock. "His jacket was still buttoned up. He was still carrying himself in a hunched position and had both hands in the pockets. He removed his right hand and got the time card, punched it out, and put it on the outside of the rack and put his hand back in his field jacket. His posture was more or less hunched over like. A field jacket is a rather bulky garment. . . ." On some points, the evidence as to what followed is conflicting.

According to Piskor, as he approached the landing he "heard this guy yelling and pointing." The man he heard was West. He was standing by the guard office. There was a guard at each railing at the top of the first flight of stairs. Piskor continued up the stairs to the landing.[4] He was "grabbed" by a guard. "I just pulled my arm away from him and I shook him off and when I did that the other guard grabbed my other arm and I just, you know, twisted around and started running away. And then I hear them yelling behind me . . . . You are walking pretty fast because there's people everywhere. . . . The fastest walk you can think." Neither the guards nor Piskor said anything when the guards grabbed him. Piskor started up the second flight of stairs leading from the landing to the exit. "Then I got a couple steps up and I hear all these people yelling a lot of commotion going on behind me and then there was guards standing at the top of them steps. . . . Approximately three or four. There was a lot of them. . . . Then they more or less sealed off that part of the stairway where I could go up, and

---

**4.** Piskor explained: "[I]t was like New Years and like everybody wanted to go home. It was the last day of the holiday and we weren't exactly walking, it was more or less like a herd of people coming out of there, and pretty fast walk or step."

once you start up you just can't walk bodily across. You have to jump over the railing, then I stopped and turned around and I wanted to see what everybody was yelling at and all, so then this guy [a guard] calls me down and says he wants to talk to me." Piskor went down — "I had no other choice" — and screamed, "Are you calling me a thief, you mother fucker? " [5] The guard did not explain why he wanted to talk to Piskor. "[H]e just told me he wanted me to go into that room in the guard shack." Piskor "did a lot of things" in response — "Yelled, screamed . . . . Why do you want to talk to me, what are you holding me here for, I'm supposed to be going home like everybody else, and why, you know, what do you want from me, things like — of that nature." He was told they wanted his name and badge number. He tried not to go into the room. He asked if he was "going to get paid for all this" but the guard "wasn't saying anything." Piskor said, "[W]ell, I'm leaving." He tried to walk away. "[A]s soon as I turned around there was about, a number — three or four guards around, just had the whole area blocked like a football huddle and I was in the middle." He was assisted into the room, "more or less," by a number of guards "and, you know, like nudging me through the door or shoving me, I guess what you call nudging or shoving." In the office he was asked to open his coat. He refused "Because they wanted me to do it. They demanded all these things." He would not give his name or his badge number. He asked for his committeeman who represented employees in labor-management matters. Because of the shift change the first shift committeeman had left. It took about 15 minutes to get the second shift committeeman. He and Piskor conversed. After further discussion, "I opened my coat, I unbuckled my pants and I showed them everything they wanted to see." He had nothing in his possession belonging to General Motors. He left. The entire incident consumed 25 to 30 minutes.

General Motors' version was given primarily through the

---

5. This, with some reluctance, was admitted by Piskor on cross-examination.

testimony of Nicely. According to Nicely, when Piskor reached the landing, Nicely said to him, "[S]tep into the office a minute, I want to see you." Nicely explained: "I wanted to see the identification card to see who he was, and primarily find out if he was this individual that was loitering in the console area prior to the quitting whistle. As soon as I asked him, I said I'd like to see you in the office a minute. He said with a great deal of profanity, are you calling me a thief. I said I want you to come in the office a minute, I want to talk to you. And there is nothing unusual about approaching an employee as he is leaving the plant. We do it dozens of times daily on all shifts. A lot of times we have a message for an employee to call his wife or tell John Brown to pick his mother up at his wife's, or pick his wife up at her mother's on his way home. Out of about three or four thousand employees, we don't know every John Brown, so we get a description of who he looks like. I may ask three or four people to step into the office a minute and what is your name. If it is the right one, I give him the message. Sometimes a foreman wants an individual back on the job to work overtime. I get the message and stop people to give them the message, but this man immediately accused me of calling him a thief, which I in no way eluded to him being a thief. I wanted to see the identification card and get his name. . . . I said no. I still want to see you in the office. I'm not calling you a thief. Give me your name and clock number. Who do you work for? And he said I'm on my own time, I don't have to go in the office. I said just come in and let me find out who you are. At this time I didn't know the gentleman was Piskor, and he said well, I'm on my own time. I better get paid for this. I said you certainly will be paid for every minute you're here. With that assurance, he came into the office." [6] When Piskor was assured he would get paid for his time, he voluntarily went into the office. Neither Nicely nor any other employee accused Piskor of doing anything wrong.

6. Nicely said that he had authority for assuring Piskor he would be paid. "It's General Motors' policy if an employee — all the time he's in on company business he will be paid for it."

Nicely asserted that none of the guards ever touched Piskor. "We have no reason to put our hands on him. In fact, we are not allowed to place our hands in a restraining manner on any employee. That is just not allowed by General Motors."

Nicely said that Piskor did not take his hands out of his pockets "the whole time" until just before he opened his jacket. Nicely denied that Piskor started up the second flight of stairs and that there were guards at the top of those stairs. "The normal position is where you have them down on the platform. We don't have any guards up there." There were four guards in all to check "packages and things." At a shift change about 2500 people leave and about 2500 come in.

It was stipulated that the guards involved in the incident were employees of General Motors and were acting within the scope of their employment. It was agreed that what authority they enjoyed derived only from their employment. There was no evidence that anyone concerned was motivated by any interest other than the performance of his duties as he understood them.

Bullock testified that while the incident involving Piskor and the guards was going on, the movement of departing employees "started to slow down for the simple reason anytime they usually have a man in the guard house they figure, well, they got him for stealing something or assume that he stolen something."

## APPLICATION OF THE *GERTZ* HOLDINGS

It is obvious that Piskor was not a public official. It is patent that he was not a public figure on the basis that he had achieved such pervasive fame or notoriety that he became a public figure for all purposes and in all contexts. It is clear that he did not assume special prominence in the resolution of a public question and did not become a public figure on the basis that he voluntarily injected himself or was drawn into a particular public controversy. The nature and extent of his participation in the incident giving rise to the defamation here do not serve to fit him into the public

figure classification. See *Gertz*, 418 U. S. at 351-352. He was, in the contemplation of the law of defamation, a private individual. Therefore, the *Gertz* holdings would apply to the defamation of Piskor only if it involved a matter of public or general interest or concern.[7]

It seems that the term "public or general interest" is from Warren and Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890), characterized by Mr. Justice White in *Cox Broadcasting Corporation v. Cohn*, 95 S. Ct. 1029, 1042, as the "root article" on privacy. See *Rosenbloom v. Metromedia, Inc., supra*, at 32, n. 2. Warren and Brandeis used it, at 214, in spelling out the first limitation on the right to privacy: "The right to privacy does not prohibit any publication of matter which is of public or general interest." They explained the term, at 214-216:

> "In determining the scope of this rule, aid would be afforded by the analogy, in the law of libel and slander, of cases which deal with the qualified privilege of comment and criticism on matters of public and general interest. There are of course difficulties in applying such a rule; but they are inherent in the subject matter, and are certainly no greater than those which exist in many other branches of the law, — for instance, in that large class of cases in which the reasonableness or unreasonableness of an act is made the test of liability. The design of the law must be to protect those persons with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity and to protect all persons, whatsoever; their position or station, from having matters which they may properly prefer to keep private, made public against their will. It is the unwarranted invasion of individual privacy which is reprehended, and to be,

---

7. The Supreme Court has used the terms "public or general interest" and "public or general concern" synonymously. See Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 44. We so consider them.

so far as possible, prevented. The distinction, however, noted in the above statement is obvious and fundamental. There are persons who may reasonably claim as a right, protection from the notoriety entailed by being made the victims of journalistic enterprise. There are others who, in varying degrees, have renounced the right to live their lives screened from public observation. Matters which men of the first class may justly contend, concern themselves alone, may in those of the second be the subject of legitimate interest to their fellow-citizens. Peculiarities of manner and person, which in the ordinary individual should be free from comment, may acquire a public importance, if found in a candidate for political office. Some further discrimination is necessary, therefore, than to class facts or deeds as public or private according to a standard to be applied to the fact or deed *per se*. To publish of a modest and retiring individual that he suffers from an impediment in his speech or that he cannot spell correctly, is an unwarranted, if not an unexampled, infringement of his rights, while to state and comment on the same characteristics found in a would-be congressman could not be regarded as beyond the pale of propriety.

The general object in view is to protect the privacy of private life, and to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn. Since, then, the propriety of publishing the very same facts may depend wholly upon the person concerning whom they are published, no fixed formula can be used to prohibit obnoxious publications. Any rule of liability adopted must have in it an elasticity which shall take account of the varying circumstances of each case, — a necessity which unfortunately renders such a

doctrine not only more difficult of application, but also to a certain extent uncertain in its operation and easily rendered abortive. Besides, it is only the more flagrant breaches of decency and propriety that could in practice be reached, and it is not perhaps desirable even to attempt to repress everything which the nicest taste and keenest sense of the respect due to private life would condemn.

In general, then, the matters of which the publication should be repressed may be described as those which concern the private life, habits, acts, and relations of an individual, and have no legitimate connection with his fitness for a public office which he seeks or for which he is suggested, or for any public or quasi public position which he seeks or for which he is suggested, and have no legitimate relation to or bearing upon any act done by him in a public or quasi public capacity. The foregoing is not designed as a wholly accurate or exhaustive definition, since that which must ultimately in a vast number of cases become a question of individual judgment and opinion is incapable of such definition; but it is an attempt to indicate broadly the class of matters referred to. Some things all men alike are entitled to keep from popular curiosity, whether in public life or not, while others are only private beause the persons concerned have not assumed a position which makes their doings legitimate matters of public investigation." (footnotes omitted)

The Supreme Court has not attempted to give a precise definition to "public or general interest." Even in *Rosenbloom* when a plurality of the Court thought the time had come "forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern", it expressly left "the delineation of the reach of that term to

future cases." [8] 403 U. S. at 44-45. It observed, however, at 42, that constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government and quoted from *Curtis Publishing Co. v. Butts*, 388 U. S. 130, 147 (opinion of Harlan, J.): "[T]he Founders . . . felt that a free press would advance 'truth, science, morality, and arts in general' as well as responsible government." It noted that comments in other cases reiterate this judgment that the First Amendment extends to myriad matters of public interest. *Id.* It gave examples of what was of public or general interest — the opening of a new play linked to an actual incident (*Time, Inc. v. Hill*, 385 U. S. 374, 388); an alleged fix of a college football game (*Curtis Publishing Co. v. Butts, supra*); federal efforts to enforce a court decree ordering the enrollment of a Negro student in the University of Mississippi (*Associated Press v. Walker*, 388 U. S. 130). Under *Cox Broadcasting Corp. v. Cohn*, 95 S. Ct. 1029, information appearing on a public record is a matter of public interest. *Rosenbloom* declared the public interest both in seeing that the criminal law is adequately enforced and in assuring that the law is not used unconstitutionally to suppress free expression. 403 U. S. at 43. It made plain that public or general interest was not dependent upon the status of the participant. "If a matter is a subject of general or public interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect and significance of the conduct, not the participant's prior anonymity or notoriety." *Id.* Although the *Rosenbloom* plurality refused to delineate the precise reach of public concern, it obviously envisioned a broad scope, albeit not an all encompassing

---

8. The failure to delineate the reach of "public or general interest" was noticed by Marshall, J., with whom Stewart, J. joined, in a dissenting opinion: "My brother BRENNAN does not try to provide guidelines or standards by which courts are to decide the scope of public concern." 403 U. S. at 79.

one. "We are not to be understood as implying that no area of a person's activities falls outside the area of public or general interest . . . We also intimate no view on the extent of constitutional protection, if any, for purely commercial communications made in the course of business." *Id.*, at 44, n. 12.[9]

Like the Supreme Court we shall not attempt to delineate with specificity the reach of public or general interest, leaving it to be determined on a case by case basis. We are in accord with Warren and Brandeis that no fixed formula can be used to prohibit obnoxious publications; there must be an elasticity which will take account of the varying circumstances of each case. We also share their view that what is of public or general interest must be broadly considered, and we shall liberally construe the term short of simply equating it with newsworthiness. The end result will be that it is purely private defamation, having no legitimate connection with public or general interest, which is not encompassed by the constitutional privilege of the First Amendment. By so broadly considering what is public or general interest or concern,[10] and excepting, in practical application, only what is purely private, self-censorship on the part of the media is substantially alleviated and a vigorous and uninhibited press effectively preserved. Mr. Justice Goldberg, concurring in *New York Times*, opined that in most cases there would be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct. 376 U. S. 301, n. 4. Recognizing that there would be a gray area, he explained, *id.*:

---

**9.** That *Gertz* found unacceptable the extension of the *New York Times* test proposed by *Rosenbloom* because of a belief that it would abridge a legitimate state interest to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual, 418 U. S. at 345-346, does not affect the concept of "public or general interest." In concluding in *Sindorf* that the *Gertz* holdings did not apply to a purely private defamation, we determined that a public or general concern was a necessary aspect of *Gertz's* basic holdings.

**10.** The terms "public or general interest" and "public or general concern" have the same meaning. See footnote 7, *supra*.

"The difficulties of applying a public-private standard are, however, certainly of a different genre from those attending the differentiation between a malicious and nonmalicious state of mind. If the constitutional standard is to be shaped by a concept of malice, the speaker takes the risk not only that the jury will inaccurately determine his state of mind but also that the jury will fail properly to apply the constitutional standard set by the elusive concept of malice."

See Restatement (Second) of Torts, § 581B (Tent. Draft No. 20, 1974), comment e.

Here, as in *Sindorf*, the defamation is by an employer imputing that an employee was a thief. We thought it so plain in *Sindorf* that the defamation was purely private as not to warrant extended discussion. We likewise think that the imputation that Piskor was a thief was not a matter of public or general interest in the constitutional sense. It is true that the Court in *Cox Broadcasting Corp. v. Cohn*, 95 S. Ct. 1029, 1045, said: "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." But this was said in the frame of reference of public law enforcement and not with respect to a bald accusation of an isolated criminal act made by one private person against another private person. See *Rosenbloom*, 403 U.S. at 43. On our independent constitutional appraisal, we find that the defamation of Piskor by General Motors was purely private.[11]

---

11. "The question as to whether the subject of a communication is a matter of public or general interest is an issue of law, to be determined by the Court. It is also a question of constitutional law, subject to review by the United States Supreme Court." Restatement (Second) of Torts § 581B (Tent. Draft No. 20, 1974) comment f.

## THE MARYLAND LAW OF SLANDER

As the alleged defamation of Piskor by General Motors was purely private, it is not within the ambit of the First Amendment and the Maryland law prevails.

### Defamation by Act

Defamation, made up of the twin torts of libel and slander, is an invasion of the right of personal security in reputation and good name. W. Prosser, *Law of Torts* § 111, at 737, (4th ed., 1971).[12] To create liability for defamation there must be an unprivileged publication of false and defamatory matter of another which is actionable irrespective of special harm, or, if not so actionable, is the legal cause of special harm to the other. *Restatement of Torts* § 558 (1938). In general, if the matter published is written, the tort is libel, and if it is oral, the tort is slander. The tort alleged by Piskor, however, does not even move along the course, uncertain as it may be, usually followed by defamation. It departs from that tortious path because the defamatory matter is neither written nor oral. It consisted of actions or conduct.

The Court of Appeals of Maryland has recognized that conduct may defame the reputation and good name of a person. In *M & S Furniture v. DeBartolo Corp.*, 249 Md. 540, pointing out that in *American Stores Co. v. Byrd*, 229 Md. 5, spoken words combined with conduct were held to be actionable, it said, at 544: "It would seem therefor that actions or conduct as well as spoken or printed words could be actionable *per se* or *per quod*." In *Montgomery Ward &*

---

12. Prosser confesses that there is a great deal of the law of defamation which makes no sense. "It contains anomalies and absurdities of which no legal writer ever has had a kind word, and it is a curious compound of a strict liability imposed upon innocent defendants, as rigid and extreme as anything found in the law, with a blind and almost perverse refusal to compensate the plaintiff for real and very serious harm. The explanation is in part one of historical accident and survival, in part one of the conflict of opposing ideas of policy in which our traditional notions of freedom of expression have collided violently with sympathy for the victim traduced and indignation at the maligning tongue."

*Co. v. Cliser,* 267 Md. 406, 418, the Court said: "Publication may be conveyed by way of gestures as well [as the overhearing by others of spoken accusations]." The few foreign cases in point are in accord. See Annot., 71 A.L.R.2d 808.

## Libel or Slander

Left unresolved in this jurisdiction is whether defamation by actions or conduct, unaccompanied by words, constitutes libel or slander. *M & S Furniture* notes, at 544: "There may be some question as to whether conduct should be classified as libel or slander but as it makes no difference in this case we will assume, as the parties seem to have done, that it constitutes libel if it was defamatory at all." In *American Stores,* the defamation was accepted as slander. Other states are divided on the point, and some have determined the issue by legislative enactment. Annot., 71 A.L.R.2d 808. As it took form in the seventeenth century the distinction between libel and slander was one between written and oral words. But methods of communication unknown at the old common law, such as talking pictures, television, and radio, have compounded the problem, leaving the court struggling with the distinction. See W. Prosser, *Law of Torts* § 112, at 752-754 (4th ed., 1971).

The second amended declaration, under which the cause here went to trial, alleged in the third count that General Motors by its conduct implied that Piskor had committed a crime and that "this slander by implication" had been observed by third persons. The tort, having been so declared by Piskor to be slander, was so accepted by the court and the parties below, who proceeded on that assumption. It was on the basis that the tort was slander that Piskor presented his case, General Motors defended the action, and the court charged the jury.[13] In arguing on appeal, both Piskor and General Motors accept that the questioned conduct, if defamatory at all, was slander.

---

13. The court told the jury: "And the third tort or wrong, of which the plaintiff in this case complains is that of slander."

It was patent that if the tort alleged to have been committed by General Motors was libel and not slander, Piskor could not prevail under the third count declaring it was slander. Therefore, we must determine whether the conduct of General Motors, assuming it was defamatory, constituted libel or slander.

*Restatement of Torts* § 568 (1938) distinguishes between libel and slander:

"(1) Libel consists of the publication of defamatory matter by written or printed words, by its embodiment in physical form, or by any other form of communication which has the potentially harmful qualities characteristic of written or printed words.

(2) Slander consists of the publication of defamatory matter by spoken words, transitory gestures, or by any form of communication other than those stated in Subsection (1).

(3) The area of dissemination, the deliberate and premeditated character of its publication, and the persistence of the defamatory conduct are factors to be considered in determining whether a publication is a libel rather than a slander." [14]

Comment d to the section at 163 discusses when a publication is libel and when it is slander:

"The publication of defamatory matter by written or printed words constitutes a libel. Common methods of publishing a libel are by newspapers, books, magazines, letters, circulars and petitions. The writing or printing may be made upon paper, parchment, metal, wood, stone or any other substance and may be accomplished by the use of pencil, pen, chalk, or a mechanical device

---

**14.** *Restatement (Second) of Torts* § 568 (Tent. Draft No. 20, 1974) makes no substantive change in § 568. It adds § 568A: "Broadcasting defamatory matter over radio or television is libel, whether or not it is read from a manuscript."

such as the printing press, typewriter, or
mimeographing machine. Defamatory pictures,
caricatures, statues and effigies are libels because
the defamatory publication is embodied in physical
form. There are, however, other methods of
publishing a libel. The wide area of dissemination,
the fact that a record of the publication is made
with some substantial degree of permanence, and
the deliberation and premeditation of the defamer
are important factors for the court to consider in
determining whether a particular communication is
to be treated as a libel rather than a slander. The
publication of defamatory matter may be made by
conduct which by reason of its persistence it may be
more appropriate to treat as a libel than a slander.
On the other hand, the use of a mere transitory
gesture commonly understood as a substitute for
spoken words such as a nod of the head, a wave of
the hand, or a sign of the fingers is a slander rather
than a libel."

Illustrations are given. A has libeled B when he procures two
men to "shadow" B and they follow him from one public
place to another until the "shadowing" becomes notorious in
the community. A has slandered C when he makes a gesture
with his fingers in the presence of B which indicates that C
has the "evil eye", a characterization which is highly
disparaging in the community. The conclusion manifest in
comment g to the section at 164-165 is that whether the
defamatory matter is libel or slander will depend upon the
circumstances of each particular case. The factors in
subsection (3) do not have to concur in order that a
publication of a defamatory communication be regarded as
libel rather than slander. On the other hand, the existence of
all of such factors does not necessarily mean that the
communication is to be deemed a libel.

Considering the relatively narrow area of dissemination of
the conduct of General Motors, the circumstances of its
publication, its lack of a substantial degree of permanence,

and the degree of deliberation and premeditation of the guards in the actions they took, we believe that the conduct, if defamatory, was slander, not libel. That is, the actions here were not an analogue of libel, but were analogous to slander.

## The *Per Se* — *Per Quod* Confusion

A publication, whether it be spoken or written words, or conduct or actions, may be defamatory upon its face or it may carry a defamatory meaning only by reason of extrinsic circumstances.[15] This distinction is not the same as that between defamation which is damaging of itself, that is, actionable *per se*, and defamation which requires proof of special damage, that is, actionable *per quod*. There is sound authority that a libel, whether it be libelous on its face or libelous only upon proof of extrinsic circumstances, requires no proof of special damage. Once it is established that the libelous publication is defamatory, damage is "presumed" as a matter of substantive law.[16]

On the other hand, slander, in general, is not actionable unless actual damage is proved. There were three specific exceptions early grafted upon this general rule — imputations (1) of crime, (2) of a loathsome disease, and (3) affecting the defamed in his business, trade, profession, office, or calling. A fourth was added by statutes and

---

15. If the publication is capable of communicating a defamatory idea when certain extrinsic facts are known or when the words or conduct are given a meaning not ordinarily attributed to them, the person claiming harm has the burden of pleading and proving such facts by way of an "inducement", and he must establish the defamatory sense of the publication with reference to such facts in an averment called an "innuendo." The function of the innuendo is merely to explain the words in the light of the facts. A publication may be clearly defamatory as to somebody, and yet not on its face refer to a particular person. In such case, the person aggrieved must sustain the burden of pleading and proof, by way of "colloquium", that the defamatory meaning attached to him. See W. Prosser, *Law of Torts* § 111, at 748-749 (4th ed., 1971); 1 F. Harper and F. James, *The Law of Torts* § 5.9 (1956).

16. This is in complete accord with *Restatement of Torts* § 569 (1938) and *Restatement (Second) of Torts* § 569 (Tent. Draft No. 20, 1974). The substance of both is that one who publishes a matter defamatory of another in such a manner as to make the publication a libel is subject to liability to the other although no special harm or loss of reputation is proved. See W. Prosser, *Law of Torts* § 112 at p. 762 (4th ed., 1971).

decisions — the imputation of unchastity to a woman. Courts Art. §§ 3-501 and 3-502. For these four kinds of slander, no proof of any actual harm to reputation or any other damage is required for the recovery of either nominal or substantial damages. That is, proof of the defamation itself is considered to establish the existence of some damages, and the jury are permitted, without other evidence, to estimate their amount. Prosser § 112, at 754; Harper and James § 5.9, at 374; *Restatement of Torts* § 570 (1938); *Restatement (Second) of Torts* § 570 (Tent. Draft No. 20, 1974).

The origin of the terms *per se* and *per quod* is discussed in Murnaghan, *From Figment to Fiction to Philosophy — the Requirement of Proof of Damages in Libel Actions,* 22 Cath. U. L. Rev. 1, 13 (1972):

> "In common law pleading, the right to recover general damages meant that the portion of the writ employed for institution of the suit devoted to specification of damage, and introduced by the words 'per quod,' became inapplicable whenever damages were presumed. To fill the void, and to signify that something had not been overlooked, the draftsmen in such cases would simply insert 'per se' where the allegations of damages, headed by the phrase 'per quod' otherwise would be expected.
>
> Since allegations of special damages were still required for those instances of oral defamation which did not fall in one of the four categories, such slander was referred to as slander 'per quod'; slander in any of the four categories was expectably then called slander 'per se'."

As courts began to distinguish between written defamation which was libelous on its face and that which was libelous only upon proof of extrinsic circumstances, some referred to the former as libel *per se* and to the latter as libel *per quod.* Thus, in the context of libel, *per quod* came to mean defamation requiring proof of extrinsic circumstances. See

Prosser § 112 at 762-763. As a result, *per quod* acquired two meanings in the law of defamation: (1) when used in the frame of reference of slander it meant proof of special damages was required; (2) when used in the frame of reference of libel it meant that proof of extrinsic circumstances was required. With respect to libel the former meaning has been engrafted on the latter with the result that libel *per quod* requires proof of both extrinsic circumstances and special damages. This is not so with regard to slander. When the terms *per se* or *per quod* were used to describe a slanderous publication, "there was no connection whatever with the question of whether the insulting words were clearly defamatory. If words had an innocent or ambiguous meaning, and so required allegations of extrinsic facts to show that a defamatory connotation was intended and understood, once sufficient allegations of that nature were made the slander was 'per se' if within one of the four categories, 'per quod' if it was not. On the slander side of the fence, this has remained established, and reasonably free from confusion up to the present." Murnaghan, *supra*, at 14. With regard to proof of special damages, it is immaterial whether the publication is slanderous on its face or requires proof of extrinsic circumstances. The special meaning which has evolved from the use of the term *per quod* in the context of libel has no validity in the context of slander. Therefore, where the defamatory matter is slanderous, and is within one of the four special categories, it is actionable without proof of special damage even if proof of extrinsic circumstances is required.[17] Dean Prosser commented caustically on the

---

17. In every Maryland case involving slander, with the possible exception of American Stores v. Byrd, 229 Md. 5, the Court of Appeals *clearly* required proof of special damages because the defamation did not fit within the four special categories of slander *per se.* According to Murnaghan, supra, note 51 at 14, the Court in *Byrd* "flirted with, but escaped making, a determination that for slander, whether the words are actionable 'per se' depends on whether the defamation is evident from the words alone." Murnaghan cites 1 A. Henson, *Libel and Related Torts,* note 5 at 24 (1969) and Henn, *Libel-By-Extrinsic-Fact,* 47 Cornell L. Q. note 5 at 31, 48-49, to support his position on the usage of the terms slander *per se* and slander *per quod.*

courts giving two meanings of libel or slander *per se* in an article in 46 Virginia Law Review 839 (1960), entitled *Libel Per Quod.* He said, at 848-849:

"These words have been used more or less indiscriminately to signify both publications which in themselves convey a defamatory meaning, without resort to any extraneous facts, and those which in themselves are necessarily damaging, or are conclusively presumed to be so, as in the case of the fourth exceptional kinds of slander. When the one meaning becomes entangled with the other, the result is that libel which is not defamatory upon its face is held to be not damaging in itself, and so is treated like slander. Such confusion there undoubtedly has been, and no doubt occasional imcompetence too, since our revered courts of ultimate conjecture have no gift of infallibility, and in this maze anyone may be forgiven for losing his way. But it will not do to say that this is the sole explanation of the avalanche of decisions in so many jurisdictions. It might have been expected that somewhere along the line even the most bewildered and incompetent court would have found able counsel to set it right."

He, however, added to the confusion. It appeared to him that the *Restatement of Torts* was out of date. He argued that the large majority of states had accepted the doctrine of libel *per quod* that required proof of special damages when the defamatory meaning of the libel was not apparent on its face. He thought, at 849-850, that if § 569 of the Restatement were revised in accordance with the "present prevailing American law", it might read:

"(1) One who publishes defamatory matter is subject to liability without proof of special harm or loss of reputation if the defamation is

(a) Libel whose defamatory meaning is apparent from the publication itself without reference to extrinsic facts, or

(b) Libel or slander which imputes to another

    (i) A criminal offense, as stated in § 571

    (ii) A loathsome disease, as stated in § 572

    (iii) Matter incompatible with his business, trade, profession or office, as stated in § 573, or

    (iv) Unchastity on the part of a woman, as stated in § 574

(2) One who publishes any other libel or slander is subject to liability only upon proof of special harm, as stated in § 575."

Prosser counted Maryland [18] as among those who followed "the present prevailing American Law", accepted, according to him, "by the overwhelming majority of our courts." *Id.*, at 844. Prosser's view was adopted in the *Restatement (Second) of Torts* § 569 (Tent. Draft No. 11, 1965) and so appeared also in Tent. Draft No. 12 (1966). Laurance H. Eldredge, Adviser and former Revising Reporter on Torts for the American Law Institute, took issue with Prosser in *The Spurious Rule of Libel Per Quod*, 79 Harv.L.R. 733 (1966).[19] He opined that this time "Homer nodded". He claimed that § 569 of the *Restatement of Torts* which declared that all libel claims are actionable without proof of special damages, represented the prevailing view of courts in the United States and should not be altered. He made an analysis of the cases in the 24 jurisdictions cited by Prosser and classified them. As for the Maryland cases, he classified *Stannard v. Wilcox & Gibbs Sewing Mach. Co.*, 118 Md. 151

---

**18.** The following cases are cited in note 33 at page 845 in support of his statement: "See Walker v. D'Alesandro, 212 Md. 163, 129 A. 2d 148 (1957); Foley v. Hoffman, 188 Md. 273, 52 A. 2d 476 (1947); Bowie v. Evening News, 148 Md. 569, 129 Atl. 797 (1925); Stannard v. Wilcox & Gibbs Sewing Mach. Co., 118 Md. 151, 84 Atl. 335 (1912)."

**19.** Eldredge is listed in *Restatement (Second) on Torts*, Tent. Draft. No. 20 (1974) as an Adviser. He attributes the origin of the term libel *per quod* to confusion on the part of the courts who "not only disregarded the fact that proof of special damages was never required in libel cases at common law, but also completely overlooked the fact that there was an area of slander that was actionable without proof of special damages, even though the plaintiff had to allege and prove the extrinsic facts that gave the words their defamatory meaning." 79 Harv.L.Rev. at 737, 738.

and *Heath v. Hughes*, 233 Md. 458, as "Cases Not Involving Extrinsic Facts, in Which Plaintiff Pleaded a Nondefamatory (Construed to be Non-defamatory) Malicious Falsehood Without Alleging Special Damages, and Court Dismissed Action With Statement That Where Words Are 'Not Libelous Per Se', 'Special Damages' Must be Averred." He classified *Bowie v. Evening News*, 148 Md. 569, *Foley v. Hoffman*, 188 Md. 273, and *Walker v. D'Alesandro*, 212 Md. 163, as "Cases Not Involving Extrinsic Facts, in Which Plaintiff Pleaded a Defamatory-on-Its-Face (Construed To Be Such) Malicious Falsehood, Without Specifically Alleging Special Damages, and the Court Held Complaint Sufficient With Dictum That Where the Words Are Not 'Libelous Per Se', Special Damages Must Be Averred." Prosser answered in *More Libel Per Quod*, 79 Harv.L.R. 1629 (1966).

Tent. Draft No. 20 (1974) of the *Restatement (Second) of Torts* went full circle.[20] Its § 569 returned to the position as it enunciated in § 569 of the *Restatement of Torts* (1938). Comment c, at 56, of Tent. Draft No. 20 adds:

> "Some courts have taken the position that a libellous publication is not actionable per se if its defamatory meaning is not apparent without reference to extrinsic facts. This minority rule, which would require proof of special harm if the libel is not found to be actionable per se, is not approved. One reason offered for its acceptance was that the defendant might not himself have known of the extrinsic facts and would therefore be held liable although innocent. This argument will be eliminated if the Supreme Court holds that liability for innocent defamation is unconstitutional." [21]

---

20. Dean Prosser died in 1972.

21. The United States District Court of Maryland faced this issue in *Sauerhoff v. Hearst Corporation*, 388 F. Supp. 117, 120 (D. Md. 1974), Kaufman, J. found it likely that

> "Maryland's highest court will reject the Restatement view in favor of Dean Prosser's position, often expressed in Maryland

## The Judgment on the Tort of Slander

### Sufficiency of the Evidence

We have discussed the confusion arising with reference to *per se* and *per quod* because General Motors falls into the trap. It makes a two-pronged attack on the sufficiency of the evidence, contending (1) that Piskor failed to prove a defamatory meaning and (2) that even if the actions of the guards were defamatory, Piskor failed to prove an "innuendo" and failed to plead or prove special damages.[22]

It is a question of law for the court to determine whether a publication is capable of bearing a defamatory meaning and a question of fact for the jury to determine whether it was in fact defamatory, that is, whether it was so understood. 1 F. Harper and F. James, *The Law of Torts* § 5.29 at 463 (1954). We do not believe the court was wrong in determining that the actions of the guards were capable of bearing a defamatory meaning. And under the circumstances, where there was a serious theft problem at the plant demanding stringent security, we find that there was no error in submitting to the jury the issue whether those actions were in fact defamatory. There was legally sufficient evidence to support the jury's finding that the actions of General Motors' guards amounted to an accusation of theft.[23]

---

> dictum, that whenever the libelous character of the words is not evident upon their face and extrinsic facts must be alleged and proven, then the libel is 'per quod' and not 'per se' and special damages must be proven."

Kaufman, J., continued:

> "However, this Court's best guess is that Maryland's highest court would not, as Dean Prosser further suggests, recognize an exception to that general rule for remarks which, although libelous per quod, would have fallen into one of the special slander per se categories." *Id.*

**22.** The reasons given for the motion for a directed verdict made by General Motors at the close of all the evidence were that there was no legally sufficient evidence that the guards slandered Piskor or if he was slandered that the defamation was published. We shall consider that these reasons sufficiently preserved the points raised on appeal.

**23.** The court charged the Jury:

> "Now, in this case there is no evidence that any employee of the defendant by spoken words called the plaintiff a thief. However, it

The failure to prove actual damages, part of the second contention, is based upon a misunderstanding of slander *per se* and slander *per quod.* Whatever the rule may be as to libel, it is clear that a slander within one of the four categories does not lose its *per se* character because proof of extrinsic circumstances is necessary. Here, as the defamation was slander *per se,* no proof of special damages was required.

That part of the second contention going to the failure to prove an innuendo is apparently bottomed on an assertion that the actions of the guards were not defamatory on their face and required proof of extrinsic circumstances to show a slanderous meaning. We find there was legally sufficient evidence to establish an imputation of criminal activity on the part of Piskor. Piskor was accosted by the guards on the stair landing where employees were checked daily for possible thievery. In *American Stores v. Byrd,* 229 Md. at 13, the Court of Appeals emphasized the importance of the circumstances surrounding an alleged slander:

> "It may well be that the words — 'did you get [or pick up] the $117 that was on the counter' — do not in and of themselves carry an imputation of having stolen the money. But there is no requirement that the defamatory words must embody an outright accusation of the commission of a crime, for '[i]n cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them.' *Garrett v. Dickerson,* 19 Md. 418, 447 (1863). And if the slanderous words used are such as in ordinary 'lay conversation' will impute, or be understood to impute guilt, that is sufficient to make them actionable *per se. Blumhardt v. Rohr,* 70 Md. 328,

---

is not necessary that actual words be spoken. A dramatic pantomime indicating to other people by acts, that the plaintiff was guilty of a crime, or guilty of some wrongdoing can be slander by act, and would amount to the same tort of slander as if the words themselves had been spoken."

17 Atl. 266 (1889). Cf. *Pollitt v. Brush-Moore, Etc., Inc.*, 214 Md. 570, 575, 136 A. 2d 573 (1957)."

General Motors, citing *M & S Furniture v. DeBartolo Corp., supra*, suggests that the conduct of its guards could not have been slanderous per se (correctly, actionable on its face) because their actions were susceptible of more than one meaning, and indeed there was evidence that there were several innocent reasons why a guard would stop a departing employee. The question as to the sufficiency of the evidence, however, is before us in the frame of reference of a motion for a directed verdict made by General Motors. See note 1, *supra*. Its motion made at the close of the evidence offered by Piskor was, of course, withdrawn when it offered evidence. Maryland Rule 522, § b. When the motion was reoffered at the close of all the evidence, the trial judge reserved his decision thereon. This constituted a denial of the motion, there being no judgment *n.o.v.* rendered for the moving party. Rule 522, § c. Therefore, in reviewing the judge's action on the motion, we must assume the truth of all credible evidence tending to sustain the contentions of Piskor, as well as all credible inferences of fact reasonably and fairly deducible therefrom. *Trionfo v. R. J. Hellman, Inc.*, 250 Md. 12, 15; *Buchanan v. Galliher*, 11 Md. App. 83, 87-88. Upon the evidence being submitted to the jury, it was their function to resolve all conflicts therein. Thus, we are bound by Piskor's version of the facts, and under his version, in the light of the constant checking for thievery, the actions of the guards in blocking his exit, in grabbing him, in yelling at him, in surrounding him and nudging and shoving him into the guardhouse where he was kept for almost half an hour, manifestly conveyed on their face that Piskor was thought to be a thief. On this evidence innocent motives on the part of the guards were eliminated. *M & S Furniture*, which concerned the curious doctrine of libel *per quod*, emphasized the absence of "peculiar circumstances which would give the conduct of the landlord the particular meaning attributed to it by the tenant. . . ." 249 Md. at 545. The Court concluded that "even considering the surrounding

circumstances . . . the conduct of the landlord . . . was susceptible of more than one meaning and for that reason could not be considered actionable *per se.* " That was not the case here.[24]

In any event, even if the actions of the guards were not deemed in and of themselves to convey a defamatory meaning, we believe that the evidence was legally sufficient to show extrinsic circumstances which supplied a slanderous imputation. General Motors argues that Bullock's assumption that Piskor was detained for suspected thievery, as set out *supra* in our recitation of the facts, was based on his knowledge of extrinsic facts, *i.e.*, Piskor's presence at the Console line before the shift change. Even accepting this as correct, ample evidence of these extrinsic facts was produced at trial, especially on General Motors' cross-examination of Piskor. Publication of the slander by the acts of the guards to a third person, Bullock, and his understanding of the defamatory meaning because of his knowledge of extrinsic facts was sufficient, in and of itself, to sustain the jury's verdict. *See Geraghty v. Suburban Trust,* 238 Md. 197, 202.

## Privilege

General Motors claims that even if the conduct of its employees were slanderous *per se,* their actions were privileged and that, as a matter of law, the privilege was not abused. They do not refer to the constitutional privilege under the First Amendment but to a qualified or conditional privilege under the common law. A qualified or conditional privilege, as distinguished from an absolute privilege, arises when a person acts to protect his own legitimate self-interest. For example, when his property has been stolen, an individual enjoys a qualified privilege when making "a reasonable effort to recover stolen property or to that end to discover and prosecute the thief. . . ." W. Prosser, *Torts* § 115 at 786 (4th ed., 1971). This self-interest privilege with regard to stolen property has been recognized

---

**24.** We note the similarity between the instant fact situation and that in American Stores Co. v. Byrd, *supra,* where the Court of Appeals found that the words and conduct were defamatory on their face.

in Maryland. *Bavington v. Robinson*, 124 Md. 85. In this State, however, a qualified privilege does not arise unless the communicating party has an interest in or duty with regard to the subject matter of the communication and the recipient has a corresponding duty or interest. *Simon v. Robinson*, 221 Md. 200, 206. This requirement of duty or interest in the recipient of the defamation has been expressed by several other authorities in a slightly different manner. According to Harper and James, communications made by an owner to protect or recover his property are privileged if "made to persons reasonably calculated to assist the owner in obtaining the return of the property or to prevent further losses. . . ." 1 F. Harper and F. James, *The Law of Torts* § 5.26, at 443, 444 (1956). *The Restatement of Torts* § 594 (1938), entitled "Protection of the Publisher's Interest", defines the privilege as follows:

> "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that
>
> (a) Facts exist which affect a sufficiently important interest of the publisher, and
>
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

In the instant case, in order to find qualified privilege, we must determine whether the recipients of the slander by act, who were all employees of General Motors, had an interest in or duty with respect to the subject matter of the defamation, that is, possible thievery by Piskor. There is ample and uncontradicted evidence in the record that a serious theft problem existed at the plant and that the employees knew of the problem.[25] As employees of General Motors they had an interest in the property of their employer and a legal duty to report all thefts and to "assist [General Motors] in obtaining the return of the property or

---

25. Piskor himself testified that lunch pails, bags, and coats carried by exiting employees were routinely checked by the guards for possible theft.

to prevent further losses. . . ." Harper and James, *supra*. Comment h to Restatement § 594 specifically states that "[u]nder the rule stated in this Section, an owner of property may communicate his reasonable belief that it is in danger of theft or harm to his employee or a police officer since such persons have a legal duty to assist him in the protection of his property interests."

It is settled law in Maryland that communications arising out of the employer-employee relationship enjoy a qualified privilege. *Hanrahan v. Kelly*, 269 Md. 21, 35; *Stevenson v. Baltimore Baseball Club*, 250 Md. 482, 486. There is some uncertainty, however, as to the basis for this privilege. The Court of Appeals in *Hanrahan* was unsure whether to classify the privilege as "arising from duty (legal or moral), common interest in the subject matter of the communication, or as a sui generis privilege." *Id.* The cases indicate that the basis for the privilege depends upon the particular circumstances of the communication. In the instant case, there was a qualified privilege based on the legitimate self interest of the employer-communicator to protect his property and the corresponding duty of the employee-recipient to assist in that protection.[26]

---

**26.** Other courts have found a qualified privilege to defame in an employer when communications concerning possible thievery are made to employees. Stephenson v. Marshall, 104 F. Supp. 26 (D. C. Alaska 1952); Sokolay v. Edlin, 65 N. J. Super. 112, 167 A. 2d 211 (1961); Combes v. Montgomery Ward & Co., 119 Utah 407, 228 P. 2d 272 (1951). *See*, Note, 10 DePaul L. R. 222 (1960). *Contra*, Washington Annapolis Hotel Co. v. Riddle, 171 F. 2d 732 (D.C. Cir. 1948). For an excellent discussion of the qualified privilege arising from the protection of property see Ling v. Whittemore, 140 Colo. 247, 343 P. 2d 1048 (1959).

We also note that in suspected thievery situations, early decisions (several involving employer-employee relationships) found a qualified privilege even when the accusation of theft was overheard by disinterested third parties. Toogood v. Spring, 4 Tyr. 582 (1834); Padmore v. Lawrence, 11 Ad. & El. 380 (1840); Brow v. Hathaway, 95 Mass. (13 Allen) 239 (1866). *See*, Note, 56 Law Q. Rev. 262 (1940). The presence of a "casual bystander" did not destroy the privilege if the communication was being made to a party who had an interest in the inquiry, but it was evidence of malicious intent abusing the privilege. *Toogood, supra* at 596-597. More recent cases have applied this concept of "casual bystander". Annot., 92 A.L.R. 1174. Although the precise point was not discussed in *Bavington, supra*, there were disinterested third parties present when the defendant slandered the plaintiff. Restatement § 604, comment a, when discussing abuse of privilege by excessive publication, states that "[i]n many cases, the communication,

A conditional privilege may be lost if abused. It is abused if the defamation was marked by malice. Malice in this context, is "a reckless disregard of the truth, the use of unnecessarily abusive language, or other circumstances which support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill will." *Stevenson v. Baltimore Baseball Club, supra,* at 487. In determining an abuse of privilege, all relevant circumstances are admissible. *Orrison v. Vance,* 262 Md. 285, 295.

Harper, *Privileged Defamation,* 22 Va.L.Rev. 642, 646 (1936) defined the functions of judge and jury with respect to conditional privilege:

> "The question whether the occasion is privileged is one for the judge and not for the jury and on this issue the burden of proof is upon the defendant. Once the occasion is ruled by the judge to be privileged, the question whether it was abused by the defendant is one for the jury, subject only to the usual censorial power of the judge [where there is no evidence of malice] and the burden on the issue is upon the plaintiff."

*Simon v. Robinson, supra,* at 205; *Jump v. Barnes,* 139 Md. 101, 111-112.

The issue of a qualified privilege was twice raised below. General Motors moved for a partial summary judgment in its favor on the slander count. Alleging that there was no genuine dispute as to any material fact, it gave as grounds that the slander was privileged and that the qualified privilege was not abused. It submitted a comprehensive memorandum of law in support of the motion. The motion was denied. The propriety of the denial is not presented on appeal, but we see no error. We said in *Vanhook v. Merchants Mutual Insurance Company,* 22 Md. App. 22, 25:

> "Maryland Rule 610 governs summary judgment

---

to be effective, must be made at a given time and place even though third persons are likely to hear it." We note that in the instant case the only method available to the agents of General Motors to investigate the possible theft was to stop Piskor as he departed with the other employees.

procedures. It has been said repeatedly that the procedure is not a substitute for a trial, but a means by which the court may determine, summarily, whether a trial is necessary. The Rule has been discussed and applied in a multitude of cases. We shall refer later to a few of them.

It is clear that in ruling on a motion for summary judgment the court does not decide disputed facts, but decides whether any real dispute as to material facts exists. *Shatzer v. Kenilworth Warehouses*, 261 Md. 88, 274 A. 2d 95 (1971), *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 272 A. 2d 42 (1971). To grant such a motion the court must determine that 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 610 d 1. In ruling on a motion for summary judgment, as we said in *Knisley v. Keller*, 11 Md. App. 269, 273 A. 2d 624 (1971) at 272-273:

> 'The function of the judge is much the same as that he performs at the close of all the evidence in a jury trial when motions for directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury, or is to be decided by the court as a matter of law.' "

It is plain that here there existed a real dispute as to material facts, particularly as to what the guards and Piskor did and did not do, and the grant of a summary judgment would have been improper.

The matter of qualified privilege was also given as a ground for the motion for a directed verdict. This motion as submitted by General Motors at the close of all the evidence included as a ground therefor that there was no legally sufficient evidence that if the guards slandered Piskor, the communication was not privileged. The motion was

supplemented orally when submitted at the trial at the close of all the evidence: "[E]ven if slander by word or by conduct were found to be present in this case there is, as a matter of law, a qualified privilege attached to the communication or acts of General Motors' employees, and that the evidence is clear, there just is no, even a scintilla of evidence any such privilege was abused to obviate its attaching to this situation." As we have indicated, ruling on the motion was reserved, and this constituted a denial of the motion, there being no judgment *n.o.v.* granted in favor of the moving party. General Motors urges on appeal that the trial court erred in denying the motion for a directed verdict because it proved the existence of a qualified privilege and Piskor failed to show evidence of abuse or malice.

We have indicated our belief that the evidence was sufficient for the court to find the existence of a qualified privilege. We do not agree, however, that the evidence was not sufficient in law for the jury to determine whether the privilege was abused. We think it was properly for the jury to determine, in the circumstances shown here, whether the guards acted with malice. Therefore, the court below did not err in denying the motion for a directed verdict.

General Motors urges that there was no basis for submission of the slander issue to the jury because there was "no slander per se", no innuendo was proved, and no special damage was proved. We have determined that slander *per se* was established, that even if it were necessary to prove innuendo, there was legally sufficient evidence to do so, and that it was not necessary to prove special damages. The correct course, therefore, was for the trial judge to submit the slander count to the jury with appropriate instructions which included the matter of qualified privilege and the abuse thereof. The charge made no reference to qualified privilege or to the abuse of it, but this is not ground for reversal because there was no objection below to the omission. Maryland Rule 554, §§ d and e. General Motors submitted requests for written instructions. There was only one instruction expressly dealing with slander. It requested the judge to charge:

"You are instructed that in order to consider any recovery by the plaintiff on the basis of a slander, you must find from a preponderance of the believable evidence that an agent of the defendant made statements publicly about the plaintiff which were false and which subjected the plaintiff to public scorn, hatred, contempt or ridicule. In addition, the plaintiff must prove that an agent of the defendant made such public statements about the plaintiff with malicious intentions toward him."

The disposition of the written requests for instructions is not reflected in the record before us. In the charge as given the judge told the jury that "[c]alling someone a thief constitutes the tort of slander", and explained, as we have set out, that the slander may be by act rather than words. But he did not touch on qualified privilege to slander or on loss of that privilege due to malice. General Motors objected to the court giving any charge as to slander "because of lack of proof." As to the charge rendered, it made an objection with regard to those parts discussing damages, the implication that the evidence was sufficient for the jury to find slander *per se*, and to "the failure of the Court to require the trier of fact also expressly [to] find that the conduct of the defendant, with regard to defamatory conduct was malicious." It made no challenge to the omission to charge as to privilege. General Motors footnotes in its brief:

"It should be noted that Appellant proffered requests for instructions to the jury setting forth the required findings of fact in cases involving qualified privilege. The lower court declined to grant those instructions. While it is the Appellant's intention that the issues under Count III should have been withdrawn from the jury, it is abundantly clear that, if the Appellee had offered proof tending to show an abuse of the privilege, the

jury should have been told of those essential elements of Appellee's case."

We find no proffered requests for instructions or objections which would present the qualified privilege issue sufficiently to preserve the point for appeal as required by Rule 554. In any event, the question of qualified privilege is presented to us on appeal in the context of the denial of the motion for a directed verdict and not with respect to error in the jury charge.

As far as sufficiency of the evidence and abuse of a qualified privilege are concerned, the judgment as to slander must stand.

## ASSAULT AND FALSE IMPRISONMENT

### Sufficiency of the Evidence

As in the slander judgment, the sufficiency of the evidence is before us in the frame of reference of the denial of the motion for a directed verdict made by General Motors, and we look at the evidence in the light most favorable to Piskor. So viewed it is plain that the evidence was sufficient in law for the jury to find that the employees of General Motors assaulted Piskor and deprived him of his liberty without his assent and without legal justification. See *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 173.

### Privilege

General Motors suggests that "even if there were legally sufficient evidence from which the jury could find that a technical assault and false imprisonment took place, the conduct of [its] employees was qualifiedly privileged under § 120A of Restatement (Second) *Torts*, which pronouncement has been adopted in substance in Maryland by the enactment of Article 27, § 551A (c), Maryland Code Annotated."

Restatement § 120A, entitled "Temporary Detention for Investigation", defines the privilege thus:

"One who reasonably believes that another has

> tortiously taken a chattel upon his premises, or has failed to make due cash payment for a chattel purchased or services rendered there, is privileged, without arresting the other, to detain him on the premises for the time necessary for a reasonable investigation of the facts."

Section 120A is *not* a restatement of the common law privilege. In *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654, the Court of Appeals emphasized that "probable cause is not a defense to an action for false imprisonment but legal justification is" and that probable cause could only be considered "in mitigation of punitive damages."[27] At 656, the Court outlined the common law position with regard to a property owner's detention of a suspected thief:

> "Any property owner, including a storekeeper, has a common law privilege to detain against his will any person he believes has tortiously taken his property. This privilege can be exercised only to prevent theft or to recapture property, and does not extend to detention for the purpose of punishment. This common law right is exercised at the shopkeeper's peril, however, and if the person detained does not unlawfully have any of the arrester's property in his possession, the arrester is liable for false imprisonment. *McCrory Stores v. Satchell*, 148 Md. 279, 286, 129 A. 348 (1925); *Allen v. London & South Western Ry. Co.*, L. R. 6 Q. B. 65 [1870]."

Article 27, § 551A (c) (1971 Repl. Vol.) provides:

> "*Civil liability for detention or arrest.* — A merchant or an agent or employee of the merchant who detains or causes the arrest of any person shall not be held civilly liable for detention, slander, malicious prosecution, false imprisonment, or false

---

27. Legal justification is "equivalent to legal authority." *Id.*, at 655. For an example of an arrest and restraint imposed under legal authority, see Autoville Limited v. Shipp, 23 Md. App. 555, 571-572.

arrest of the person detained or arrested, whether the detention or arrest takes place by the merchant or by his agent or employee, if in detaining or in causing the arrest of the person, the merchant or the agent or employee of the merchant had at the time of the detention or arrest probable cause to believe that the person committed the crime of shoplifting as defined in this section.

General Motors claims that by enacting § 551A the Legislature has changed the common law to create a qualified privilege for all property owners who have "probable cause to believe" that an individual has stolen their property. Piskor disagrees, arguing that § 551A only applies to a "merchant" who has probable cause to believe that an individual has "committed the crime of shoplifting." Piskor emphasizes that the "statute is in derogation of the common law, and therefore must be 'strictly construed, and it is not to be presumed that the legislature intended * * * to make any alteration in the common law other than what was specified and plainly pronounced.' *Gleaton v. State*, 235 Md. 271, 277, 201 A. 2d 353 (1964)."

General Motors cites to dicta in several Court of Appeals decisions and to the legislative history of § 551A (c) to support its position. In *Paul, supra,* A & P was sued for a false imprisonment arising out of a suspected shoplifting incident. A & P asked for a jury instruction embodying § 120A. The lower court's refusal to give such an instruction was upheld on appeal. After noting, at 656, that Art. 27, § 551A (c) "substantially embodied the rule of Restatement (Second) of Torts Sec. 120A (1965)", the Court based its decision on the prior history of § 551A (c). In 1967 *Clark's Park v. Hranicka,* 246 Md. 178, held that § 551A (c) was void because of a titling defect. The Court refused, at 657, to re-enact judicially the unconstitutional provision:

"The decision in *Hranicka* left intact the other provisions of 551A but necessarily restored the older rule of law as to civil liability. After this holding the Legislature did not re-enact subsection

136

(c) with proper titling, but after debating the respective rights of merchants and shoppers took no action except to repeal the void subsection altogether by Chapter 197 of the Acts of 1968. In view of this resolution by the Legislature we do not believe we should remake the law in this area, even if we were inclined to do so.

As it now stands in this state arrest or detention without legal authority, with or without probable cause, will render the arresting person liable for such damages 'as the jury may consider actual compensation for the unlawful invasion of his [the plaintiff's] rights and the injury to his person and feelings.' "

Within four months of the *Paul* decision the Legislature re-enacted § 551A (c). Acts 1970, ch. 739. Since that provision was in effect when the suspected shoplifting situation occurred in *Montgomery Ward v. Cliser*, 267 Md. 406, probable cause was a defense in that case. When discussing the issue of punitive damages, the Court opined, at 421:

"It may well be that Code (1957, 1971 Repl. Vol.) Art. 27, § 551A has added a new dimension to the tort of false imprisonment in requiring that want of probable cause be established. Since malice may be implied from want of probable cause, . . . , it would now seem possible to recover punitive damages in a false arrest case without proof of actual malice."

We take none of this as an indication that the Court of Appeals thought that § 551A applied to all false imprisonment cases. We have not the slightest doubt that the statute applies only to shoplifting, and when the false imprisonment or the other specified torts arise from that crime. We so held in *Kimbrough v. Giant Food, Inc.*, 26 Md. App. 640, 339 A. 2d 688. We said, at 644: "Article 27, § 551A (c), by its express terms, changed the common law so that the existence of 'probable cause' for an arrest or detention with respect to the crime of shoplifting relieved a merchant

from civil liability when false arrest or imprisonment was claimed . . . In the case of false arrest and imprisonment . . . a merchant is relieved from civil liability only if the crime causing the arrest or detention is shoplifting as that crime is defined in the Act." See *Washington County Kennel Club, Inc. v. Edge,* 216 So. 2d 512 (Fla. App. 1968), *cert. den.* 225 So. 2d 522 (1969) which construing a comparable statute is in accord with our view.

The crime causing the detention of Piskor was clearly not shoplifting within the contemplation of the statute. Therefore the privilege created by § 551A did not apply to General Motors.[28] General Motors' assertions that the evidence was not sufficient to establish false imprisonment and assault and that, in any event, the false imprisonment and assault were privileged, provide no grounds for reversal of the judgments.

## PUNITIVE DAMAGES

General Motors claims that there was no legally sufficient evidence to support an award of punitive damages, and concludes: "The trial court should have granted [General Motors's] motion for a directed verdict with regard to that issue."

General Motors points out that it is the well settled law of Maryland that punitive or exemplary damages may be awarded only upon proof of actual malice or its legal equivalent. It cites *B. & O. R. R. Co. v. Boyd,* 63 Md. 325 to show that this was the law as early as 1885 and refers to *Seigman v. Equitable Trust Company,* 267 Md. 309, *Drug Fair v. Smith,* 263 Md. 341, and *Associates Discount Corporation v. Hillary,* 262 Md. 570 to show that this is the law today. But as was the case in *Newton v. Spence,* 20 Md. App. 126, "[t]his argument, however, overlooks the exceptional nature of an action for defamation *per se* in

---

**28.** We do not reach the question whether the privilege under § 551A reaches an assault arising from the crime of shoplifting. We observe, however, that assault is not one of the torts designated in the statute for which a merchant shall not be held civilly liable. But see *Restatement (Second) of Torts* § 120A, comment h.

Maryland where the established rule is that when words are actionable *per se* and are uttered without privilege or justification, punitive damages are recoverable without proof of actual malice." At 140.[29] We have held that the defamation here was slander *per se* and that the motion for a directed verdict on the ground of qualified privilege was not improperly denied because even though a qualified privilege arose, whether it was abused and therefore lost was a jury question in the circumstances. No objection was made for failure to instruct the jury as to privilege, and the point of privilege in the context of the jury charge was not preserved for appeal. Thus, as the case was tried, the jury was free to award punitive damages with respect to the slander count.

The jury awarded Piskor only one amount as punitive damages. This was according to the teaching of *Montgomery Ward v. Cliser, supra,* at 424-425, which held that when damages arise out of an episode which was one continuous occurrence, they may not be duplicated for the same tortious activity. In other words, a person may not be punished more than once for the same wilful, wanton and malicious conduct. That is a jury may not pyramid the claims arising under separate torts into a multiple recovery of punitive damages on the basis of an episode that was one continuous occurrence. Here the jury could properly award punitive damages under its finding that General Motors slandered Piskor, the defamation being slander *per se*. General Motors does not claim that the award for punitive damages imposed multiple punishments on it.[30] Its contention goes only to the

---

**29.** We observed, *id.*: "While this is not the majority rule and has been scored by at least one authority on the law of damages, [noting McCormick, *Handbook on the Law of Damages* (1935)] it was enunciated at an early date in Maryland and has been consistently followed by the Court of Appeals", citing cases to support our assertion. General Motors recognizes that actual malice need not be shown to support an award of punitive damages in slander *per se*, actual malice being presumed. It declares, however, that the defamation was not slander *per se*, but we have made clear that we are not in agreement with this view.

**30.** The issue to the jury regarding punitive damages was framed in the context of the other three issues given the jury. The jury were asked if they found that Piskor was (1) assaulted, (2) falsely imprisoned, and (3) slandered. The fourth issue read that if they answered "yes" to any of those

sufficiency of the evidence to show malice. The award of punitive damages must stand.

*Judgments affirmed; costs to be paid by appellant.*

three, "then in what amount do you assess the punitive or exemplary damages? "

General Motors did not request that the trial court furnish additional guidelines to the jury in its consideration of whether to award punitive damages. Nor did they request that the jury be told that punitive damages may be mitigated by showing that General Motors had probable cause to believe that Piskor was a thief. And it did not challenge the instructions with regard to punitive damages as the court below gave them except to argue that the jury should be precluded from such an award because of the absence of any evidence of malicious conduct.