# GENERAL MOTORS CORPORATION *v.* PISKOR

[No. 61, September Term, 1975.]

*Decided March 3, 1976.*

The cause was argued before Murphy, C. J., and Smith, Levine, Eldridge and O'Donnell, JJ., and reargued before Murphy, C. J., and Smith, Levine, Eldridge and O'Donnell, JJ., and Matthew S. Evans, Associate Judge of the Fifth Judicial Circuit and Robert F. Sweeney, Chief Judge of the District Court of Maryland, specially assigned.

Argued by *Edward S. Digges, Jr.*, and *Francis B. Burch, Jr.*, with whom were *Joseph G. Finnerty, Jr.*, and *Frazer F. Hilder* on the brief; and reargued by *Joseph G. Finnerty, Jr.*, for appellant.

*Amicus Curiae* brief of Francis D. Murnaghan, Jr., *Francis D. Murnaghan, Jr.*, on the brief.

Argued and reargued by *Leo A. Hughes, Jr.*, with whom were *Robert W. Fox, Ronald L. Lapides* and ·*Steen, Hughes & Seigel* on the brief, for appellee.

Levine, J., delivered the opinion of the Court.

The questions presented here have much in common with those considered in *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A. 2d 688 (1976). This case arises from an action for damages brought in the Superior Court of Baltimore City by appellee, Roy J. Piskor (Piskor), against his employer,

General Motors Corporation (General Motors), the appellant. A jury awarded Piskor compensatory damages of $1,000 for slander, $300 for assault, and $200 for false imprisonment. It also assessed punitive damages of $25,000. On appeal, the Court of Special Appeals affirmed. *General Motors Corp. v. Piskor*, 27 Md. App. 95, 340 A. 2d 767 (1975). We then granted certiorari.

On December 30, 1969, the date on which the incident precipitating this case occurred, Piskor, then 19 years of age, was employed by General Motors at its automobile assembly plant in Baltimore. Within a matter of minutes, shortly before the end of his shift, he twice left his place on the "hard trim line" to visit a fellow employee who worked on the "console line." It was on the console line that such components as radios, tape players and tachometers were installed in automobiles, necessitating the storage of a quantity of those items nearby. Largely because of their small size and high value, these items presented something of a security problem as evidenced by the significant loss by theft which had been experienced.

Approximately 15 to 20 minutes before the end of the shift on the day in question, Piskor made his first visit to the console line to check with his fellow employee about a ride home. He then returned to his own work area. A few minutes before the shift was to end, he again visited the same employee, this time fully clothed in his street apparel, which included an army fatigue jacket that was zipped up to the neck. The jacket had two large "kangaroo" pockets in front, which were of sufficient size to permit the wearer to touch his hands together while inside the pockets. The foreman of the console line, whose responsibilities included the care of components being installed under his supervision, observed Piskor during both vists. In describing the second visit, he depicted Piskor as leaving with his hands in the two front pockets while "in a stooped or hunched fashion with his hands pushed forward in the front of his jacket." His posture and movements created the effect of his jacket "sticking out some from his stomach." The shift having then ended, Piskor left his friend a second

time and passed through his own work area without stopping, heading directly for the exit. After witnessing all this, the foreman of the console line telephoned a sergeant on the security force and asked him to watch out for Piskor, whom he described to the sergeant, and to "see if he noticed anything suspicious."

In order for the employees to exit from the assembly plant, it was first necessary for them to "punch out" at one of the time clocks, and then to climb two flights of stairs before reaching the door to the outside. On the landing between these two stairways was a room with plate glass walls, which was called the "guard shack." Security guards were routinely positioned on this landing during shift changes to inspect any packages or purses being carried by employees.

What transpired from the moment of Piskor's arrival at the stairs, by this time crowded with many other employees, is the subject of some dispute. According to Piskor's own testimony, as he was ascending the first flight, he observed the foreman of the console line pointing at him and shouting. Once on the landing, he was "grabbed by one guard" from whom he wrestled free only to have another guard make the same attempt. He then began to run or walk rapidly up the second flight of stairs only to find other guards blocking his path, giving him "no other choice" but to return to the landing. When asked what occurred there, Piskor replied: "At that point he said he wanted to talk to me. And then I asked him if he was calling me a thief."

According to Piskor, the guards indicated that they wanted him to go into the guard shack. He balked at this and, in his own words, "yelled" and "screamed" at them in an effort to discover why they were detaining him. They merely replied that they wanted to establish his identity. They "assisted" him, he said, into the guard room and he, after resisting for some time their efforts at persuading him to open his jacket, ultimately threw it open, unbuckled his trousers gratuitously and "showed them everything they wanted to see." It developed that he had not concealed any General Motors' property beneath the jacket. On cross-

examination, he not only repeated his earlier testimony that, when first approached, he had spontaneously shouted "are you calling me a thief," but also conceded that at the time he uttered a few obscenities. After demonstrating inside the guard shack that nothing was hidden beneath his jacket and denying that he had taken any property, Piskor was released. The entire incident had consumed some 25 or 30 minutes.

When questioned concerning the impact of the occurence, Piskor replied: "Much effect it had on everybody, I guess, you hear people talking about it all the time, you know, talking to you about it, talking to other people about it, you don't know. It could have affected me in a lot of ways." [1] One witness, who at the time did not know Piskor personally, testified that as he was leaving the plant he observed Piskor in the glass "guard shack" being held by the arms by guards on either side of him. Also among the three witnesses who testified in support of Piskor's case was the employee with whom he had visited on the console line. The latter testified that "[it] is not a normal procedure, for a guard to put their hand on anyone"; that this occurs only when a guard "definitely knows that [a] man is taking something out of that plant ... that doesn't belong to him. This is the procedure." He explained that "the [employee] traffic started to slow down ... for the simple reason [that] anytime they ... have a man in the guard house [his fellow employees] figure, well, they got him for stealing something or assume that he stole something."

The sergeant of the security force presented a different version of the same incident. He recognized Piskor as he approached the time clock from the description furnished by the foreman because his "posture was more or less hunched over like." He testified that he asked Piskor to step into the office for "a minute." At this, Piskor "said with a great deal of profanity, are you calling me a thief." The security guard testified that there was nothing unusual about approaching

---

1. At the time of the trial in April 1974, Piskor had been continuously employed at the same plant since the December 1969 episode, save for a 22 month interruption for military service.

an employee as he was departing from the plant: "We do it dozens of times daily on all shifts. A lot of times we have a message for an employee . . . ." The guard denied in any way alluding to Piskor as a thief, and also denied that any General Motors employee touched him.

The trial court (Ross, J.) reserved rulings on motions for a directed verdict made at the end of the plaintiff's case and at the close of all the evidence; both motions were aimed essentially at the alleged insufficiency of the evidence regarding the three-pronged tortious conduct charged to General Motors. Exceptions to portions of the jury instructions implemented these challenges. Following the rendition of the verdicts, the court denied a motion for judgment n.o.v. made by General Motors.

In affirming, the Court of Special Appeals adhered to the view it had adopted in its opinion in *Sindorf v. Jacron Sales Co.*, 27 Md. App. 53, 341 A. 2d 856 (1975), that *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974), decided some two months after the trial of this case, applied only to private persons who had been defamed as to matters of "public or general interest." Thus, since this case involved neither a public person nor a matter of public or general interest, the court held that prior Maryland defamation law prevailed. Having also decided that the evidence of slander warranted submission of that issue to the jury, the court held that there was sufficient evidence for the jury to determine whether the conditional privilege protecting General Motors had been abused. Finally, the court held that there was sufficient evidence for the jury to find that Piskor had been assaulted and falsely imprisoned, and to support the verdict for punitive damages.

In this Court, General Motors advances these contentions:

I. That the Court of Special Appeals erred in holding that *Gertz* has no application to this case.

II. That there was insufficient evidence that General Motors had abused the common law conditional privilege to permit submission of that issue to the jury.

III. That there was insufficient evidence of malice to support the verdict for punitive damages.

## I

Little need be added here to what we said in *Jacron*, since, like that case, this is one of purely private defamation. There, we read *Gertz* as being applicable to defamation actions brought by private persons without regard to whether the subject matter was one of public or general interest. In adopting the *Gertz* principles as a matter of state law, we held that they applied to cases of slander and libel alike brought against non-media defendants.[2] Accordingly, we held that the negligence standard set forth in Restatement (Second) of Torts § 580B (Tent. Draft No. 21, 1975) must be applied in cases of purely private defamation.[3] Under this negligence standard, truth is no longer an affirmative defense; instead, the burden of proving falsity rests upon the plaintiff. Further, fault, in cases of purely private defamation, must be established by the preponderance of the evidence.

---

**2.** General Motors has conceded, as it must, that defamatory matter may be published by actions and gestures as well as by the written and spoken word. *See* M & S Furniture v. DeBartolo Corp., 249 Md. 540, 544, 241 A. 2d 126 (1968); Restatement of Torts § 568 (2) (1938). Here, the jury was properly permitted to conclude that the conduct of the defendant's employees, such as the waving of a finger in front of the plaintiff, conveyed to the plaintiff's fellow employees a defamatory imputation of theft. In light of our holding that *Gertz* applies to cases of slander and libel alike, it becomes unnecessary to decide whether the actions relied upon here constituted libel or slander. The Court of Special Appeals, noting that the case had been treated in the pleadings and at the trial as one of slander, held that under the circumstances of the case, "the conduct, if defamatory, was slander, not libel." General Motors Corp. v. Piskor, 27 Md. App. 95, 117, 340 A. 2d 767 (1975). In view of the unanimity with which this case had been regarded as one of slander, we shall refer to it in the same manner for purposes of this opinion.

**3.**
"§ 580B. *DEFAMATION OF PRIVATE PERSON.*

"ONE WHO PUBLISHES A FALSE AND DEFAMATORY COMMUNICATION CONCERNING A PRIVATE PERSON, OR CONCERNING A PUBLIC OFFICIAL OR PUBLIC FIGURE IN RELATION TO A PURELY PRIVATE MATTER NOT AFFECTING HIS CONDUCT, FITNESS OR ROLE IN HIS PUBLIC CAPACITY, IS SUBJECT TO LIABILITY, IF, BUT ONLY IF, HE
"(a) KNOWS THAT THE STATEMENT IS FALSE AND THAT IT DEFAMES THE OTHER,
"(b) ACTS IN RECKLESS DISREGARD OF THESE MATTERS, OR
"(c) ACTS NEGLIGENTLY IN FAILING TO ASCERTAIN THEM."

In conformity with what was then controlling state law, the trial of the defamation claim in this case proceeded on the premise of liability without fault, rather than upon some greater standard such as negligence. Since the *Gertz* and *Jacron* principles are equally applicable here, we hold that a new trial is required where the plaintiff shall be required to establish the liability of the defendant through proof of falsity and negligence by the preponderance of the evidence, and may recover compensation limited to actual injury as defined in *Gertz* and *Jacron*.

## II

The Court of Special Appeals agreed that General Motors was protected by a common law conditional privilege with respect to the defamation in this case, but rejected the contention that there was insufficient evidence for the jury to find that the privilege had been forfeited by abuse. General Motors renews that contention here.

In *Jacron*, we reaffirmed the definition of malice necessary to defeat a conditional privilege to defame which we had previously enunciated in *Stevenson v. Baltimore Club*, 250 Md. 482, 486-87, 243 A. 2d 533 (1968):

> "The privilege may be lost, however, if the plaintiff in a defamation case can show malice, which in this context means not hatred or spite but rather a *reckless disregard of truth*, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will." (emphasis added).

*Accord, Orrison v. Vance*, 262 Md. 285, 295, 277 A. 2d 573 (1971). Thus, as we indicated in *Jacron*, the "reckless disregard" standard now appears to be firmly established in Maryland as a test, albeit not the exclusive test, for abuse of a conditional privilege to defame. The Court of Special Appeals applied the correct test in determining whether there was sufficient evidence of abuse to submit that issue to the jury. The thrust of General Motors' complaint,

however, is that although the Court of Special Appeals applied the correct standard for deciding whether the privilege had been abused, it erred in concluding that there was sufficient evidence to meet the test.

Although the Court of Special Appeals did not cite any specific evidence in deciding the sufficiency issue, we agree with its holding. Here, the foreman himself testified that as part of his duty to account for materials being installed on the console line, he was required to make an inventory check of radios and tape players during the 30 minute period between shifts. Since Piskor's departure coincided with the end of a shift, the routine inventory check made in the few minutes after the foreman's suspicions were first aroused or during the period of Piskor's detention might have revealed whether there were any shortages. Reasonable persons could have found that the failure to take these measures in lieu of the course of conduct in fact undertaken by General Motors amounted to a "reckless disregard of truth." *See Sumner Stores of Mississippi v. Little*, 187 Miss. 310, 192 So. 857, 862 (1940).

Moreover, the evidence indicates that Piskor was forced into the glass-enclosed office where management precipitated a confrontation in full view of virtually two entire shifts, about 5,000 employees in all, who, on their way in or out of the plant, necessarily filed past the office.[4] A conditional privilege to defame may be abused not only by publishing the defamation in reckless disregard of the truth, but also by publication to third persons other than those whose hearing is reasonably believed to be necessary or useful to the protection of the interest, *i.e.*, by an excessive publication.[5] Restatement of Torts § 604 (1938); W. Prosser,

---

4. There was testimony to the effect that employee traffic slowed when passing the guard shack, the inference being that this was occasioned by the employees' pausing to observe the activities inside.

5. It should, perhaps, be noted that the standard by which the excessiveness of a publication is measured is negligence, *i.e.*, reasonable belief in the existence of facts, not reckless disregard. We regard the doctrine of abuse of privilege by excessive publication as one related to the extrinsic question of the existence of a privilege, as opposed to the perhaps more common instance of abuse involving the intrinsic question of the truth or falsity of the publication where the standard is reckless disregard as to truth or falsity. Jacron Sales Co. v. Sindorf, 276 Md. 580, 350 A. 2d 688

Law of Torts § 115 at 792-93 (4th ed. 1971). The conduct of General Motors' management, if found by the jury to contain an imputation of theft, might have been regarded as excessive under the circumstances and therefore an abuse of the privilege.

We hold, therefore, that there was sufficient evidence to warrant submitting to the jury the question whether the conditional privilege had been abused.

### III

The attack leveled on the punitive damage award is founded on the absence of "common law malice," as distinguished from the "constitutional malice" articulated in *New York Times Co. v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964). Prior to considering this argument, it becomes necessary to advert once again to the *Gertz* holding. As we noted in *Jacron*, the Supreme Court in *Gertz* not only jettisoned strict liability as a standard for recovery in dafamation actions brought by private plaintiffs, but also held that where the *New York Times* test of knowing or reckless falsity is not met, the state may permit recovery for actual injury but not presumed or punitive damages.

Here, the jury was instructed that Piskor could recover punitive damages by proving actual malice, that is, malice in the sense of ill-will or wantonness. As the issues were framed for the jury, it was free to award punitive damages if it found that there had been an assault, false imprisonment, or slander, accompanied by actual malice. Punitive damages may not, however, absent compliance with *New York Times*, be awarded on the slander charge in light of our application of the *Gertz* holding. The trial court,

(1976). We have held that a privilege exists even though, for instance, the recipient of the publication had in fact no interest in its subject matter, if the publisher reasonably believed that circumstances giving rise to a privilege existed. Simon v. Robinson, 221 Md. 200, 206, 154 A. 2d 911 (1959). The same standard, reasonable belief, obtains where, as here, a privilege in fact exists as to some recipients of the publication, but not as to others. *See* Restatement of Torts § 604 (1938). It may further be noted that even as to those with respect to whom a publication is privileged, excessive publication may be evidence of malice. *See* Fresh v. Cutter, 73 Md. 87, 93-94, 20 A. 774 (1890).

of course, was correct in permitting only one award of punitive damages, *see Montgomery Ward & Co. v. Cliser,* 267 Md. 406, 424-25, 298 A. 2d 16 (1972), but since the jury found the defendant liable on all three claims, and awarded compensatory damages in varying sums on each, we cannot determine the extent, if any, to which the sum allowed for punitive damages was specifically linked to the slander. The punitive damage award, therefore, must be reversed.

In summary, to recover under the slander claim, Piskor shall be required at a new trial to establish the liability of the defendant through proof of falsity and negligence by the preponderance of the evidence. He may then recover compensation for actual injury as defined in *Gertz* and *Jacron,* but not presumed or punitive damages unless he meets the *New York Times* standard of knowing falsity or reckless disregard for the truth. Should the court again determine that General Motors was protected by a common law conditional privilege, the question whether it was lost by abuse shall be governed by the rules expressed here and in *Jacron.*

The sufficiency of the evidence on the assault and false imprisonment claims, when viewed most favorably to the plaintiff, is too clear to warrant comment. The compensatory damage awards on those two claims, therefore, must stand. Although Piskor is barred from an award of punitive damages on the slander count absent proof meeting the *New York Times* test, he may again press his claim for punitive damages for the assault and false imprisonment. While the issue of punitive damages on those two counts must be retried for the reasons already stated, a word is in order regarding the contention of General Motors that there was insufficient evidence of malice at the previous trial to support a recovery of such damages. We have consistently held, it is true, that punitive damages may be awarded only when there is an element of fraud, malice, evil intent or oppression which enters into and forms a part of the wrongful act. *Food Fair Stores v. Hevey,* 275 Md. 50, 53-54, 338 A. 2d 43 (1975); *H & R Block, Inc. v. Testerman,* 275 Md. 36, 43, 338 A. 2d 48 (1975); *Wolf v.*

*Levitt & Sons,* 267 Md. 623, 626-27, 298 A. 2d 374 (1973); *Drug Fair v. Smith,* 263 Md. 341, 351-53, 283 A. 2d 392 (1971). It is equally clear, however, that the issue of such damages may properly be submitted to the jury where an assault is committed in a wanton *or* malicious manner, *Montgomery Ward & Co. v. Cliser, supra,* 267 Md. at 419-20; *Vancherie v. Siperly,* 243 Md. 366, 373-74, 221 A. 2d 356 (1966), and that the same rule applies in false imprisonment cases, *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448-49, 340 A. 2d 705 (1975); *Montgomery Ward & Co. v. Cliser, supra,* 267 Md. at 420-21. We think that the conduct of the General Motors employees reflected sufficient evidence of wantonness to warrant submission of the punitive damage claim to the jury. These same principles would, of course, apply to this issue at the retrial.

> *Judgment of the Court of Special Appeals reversed except as herein set forth; remanded to that Court with instructions to reverse the judgment of the Superior Court of Baltimore City except as herein set forth, and to remand for a new trial; each party to pay its own costs.*