Brennen BAKER,
Appellant/Plaintiff/Counterclaim
Defendant,

and

Moisture Management,
Appellant/Third–Party
Defendant,

v.

TREMCO INCORPORATED and Rick Gibson, Appellees/Defendants/Counterclaim Plaintiffs/Third–Party Plaintiffs.

No. 29A02–0711–CV–1001.

Court of Appeals of Indiana.

July 16, 2008.

Rehearing Denied Oct. 8, 2008.

Andrew W. Hull, Daniel K. Burke, Hoover Hull LLP, Indianapolis, IN, Attorneys for Appellants.

Mark J.R. Merkle, Anthony W. Mommer, Krieg DeVault LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BRADFORD, Judge.

Appellant/Plaintiff/Counterclaim Defendant Brennen Baker and Appellant/Third–Party Defendant Moisture Management appeal the trial court's grant of partial summary judgment in favor of Appellees/Defendants/Counterclaim Plaintiffs/Third–Party Plaintiffs Tremco Incorporated] and Rick Gibson. Baker and Moisture Management contend that the trial court erroneously granted summary judgment to Tremco and Gibson with respect to their claims that (1) Baker's covenant not to compete with former employer Tremco is unenforceable, (2) Tremco tortiously interfered with Baker's business activities, (3) Tremco wrongfully discharged Baker, (4) Gibson defamed Baker, and (5) Tremco violated Indiana's blacklisting statute. We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Tremco manufactures and sells various products for the construction and maintenance of roofing systems. Weatherproofing Technologies Incorporated ("WTI") is a wholly-owned subsidiary of Tremco's, engaged in general contracting work, including the installation of roofing systems. On July 19, 1991, Baker and Tremco entered into a "Representative's Agreement" ("the Agreement"), in which Tremco agreed to employ Baker to "sell and promote the sale of such [Tremco] products as may be assigned to him to sell, in such areas or to such accounts as may be assigned by [Tremco]." Appellees' App. p. 32. Tremco was identified in the Agreement as "the Company," which was defined as "Tremco incorporated, its successors, and assigns[.]" Appellees' App. 32.

The Agreement included, *inter alia*, a noncompete clause, which provides in relevant part as follows:

15. a. [Baker] agrees that in consideration of his employment and the investment by [Tremco] in his training, that during the term of his employment and for a period of 18 months after the

termination of his employment under this Agreement for any reason (such period not to include any period of violation or period of time required for litigation to enforce the covenants this paragraph 15), [Baker] will not directly or indirectly, for himself, or as an agent of employee of, or on behalf of or in conjunction with, any Person, or as a partner in any partnership, or as a shareholder, director or officer of any corporation, or otherwise:

 i) in any business, for any purpose or in any place, employ or solicit for the purpose of employment any natural person employed by [Tremco]; or

 ii) compete with [Tremco] in any aspect of any Applicable business in the areas in which the Applicable business is being conducted by [Baker] on the date of termination of [Baker's] employment or in which it has been conducted by [Baker] during the 24 month period which precedes such termination date; or

 iii) solicit or attempt to solicit any Applicable business, or accept any Applicable business, from any Customer.

Appellees' App. p. 35. The Agreement defined "Applicable Business" as "any business being conducted by [Tremco] at the date upon which [Baker's] employment with [Tremco] terminates or which [Tremco] has conducted within the 24 month period preceding such termination date." Appellees' App. p. 32.

During the course of Baker's employment with Tremco, he was trained in the promotion of goods and services through the Association of Educational Purchasing Agencies (which is an association of school systems that cooperatively purchased goods and services), in roof asset management programs, and in thermal imaging that would reveal areas of a roof in need of repair. Baker's duties at Tremco were to sell field inspection services, roof asset management services (including patch and repair services), and roofing supplies and products. Baker received commissions on sales of WTI services and Tremco products.

On January 5, 2004, Baker resigned his position with Tremco, due, according to his resignation letter, to "breaches in verbal agreements, and what [Baker felt had] been unethical behavior of Tremco Sales Management[.]" Appellees' App. p. 37. In late 2004, Baker, who had formed Moisture Management, began contacting some of the same customers, in the same territory, that he had serviced while at Tremco, providing roof consulting, waterproofing consulting, patch and repair services, and roof asset management services.

On November 23, 2004, after Tremco sent Baker a cease-and-desist letter, he filed a complaint against Tremco and Rick Gibson, his former supervisor, for declaratory judgment and money damages. Baker sought to have the noncompete clause declared unenforceable and sought damages for Tremco's alleged tortious interference with his business, alleged violation of Indiana's "blacklisting" statute, and alleged breach of the Agreement by Tremco.[1] Tremco counter-sued Baker and brought in third-party defendant Moisture Management, alleging breach of the Agreement by Baker, tortious interference by Moisture Management, and a trade secrets violation by Baker.

---

1. At some point not entirely clear from the appellate record, Baker apparently added a defamation complaint against Gibson.

Tremco and Gibson filed a motion for partial summary judgment, contending that no genuine issue of material fact remained with respect to Baker's claim against Tremco that the noncompete clause was unenforceable, Baker's defamation claim against Gibson, and Baker's claims against Tremco of tortious interference, blacklisting, and wrongful discharge. On May 17, 2007, the trial court granted summary judgment in favor of Tremco and Gibson, concluding that "Judgment is hereby entered in favor of [Tremco and Gibson] and against Baker on all claims alleged in Baker's Complaint, and Baker shall have and recover nothing from [Tremco and Gibson]." Appellants' App. p. 695.

## DISCUSSION AND DECISION

### *Standard of Review*

· When reviewing the grant or denial of a summary judgment motion, we apply the same standard as the trial court. *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind.Ct. App.2000). Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.* To prevail on a motion for summary judgment, a party must demonstrate that the undisputed material facts negate at least one element of the other party's claim. *Id.* Once the moving party has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue does in fact exist. *Id.* The party appealing the summary judgment bears the burden of persuading us that the trial court erred. *Id.*

## I. Covenant Not to Compete

■ Baker contends, *inter alia,* that he did not violate the covenant not to compete with Tremco because he completed only with Tremco's subsidiary WTI, not with Tremco itself. As an initial matter, the Agreement provides that it "shall be governed by the internal laws of the State of Ohio." Appellants' App. p. 641. Ohio courts have established that "restrictive covenants not to compete are disfavored by law." *Clark v. Mt. Carmel Health,* 124 Ohio App.3d 308, 706 N.E.2d 336, 340 (1997). Further, a restrictive covenant will "be enforced only to the extent that the restraints imposed thereby are reasonably necessary to protect the employer's legitimate business interests." *Brentlinger Ents. v. Curran,* 141 Ohio App.3d 640, 752 N.E.2d 994, 998 (2001) (citing *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544, 546–48 (1975)).

■ Baker contends that he could not have violated the noncompete clause because he did not compete against Tremco but only against its subsidiary, WTI, and the two are completely separate entities. Tremco maintains that competing against WTI is equivalent to competing against Tremco. Essentially, Tremco is asking to have its own corporate structure disregarded. Generally, a parent corporation and its subsidiary are considered to be separate legal entities, even if the subsidiary is wholly owned by the parent corporation. *LeRoux's Billyle Supper Club v. Ma,* 77 Ohio App.3d 417, 602 N.E.2d 685, 687–88 (1991). Although we acknowledge that, in one circumstance recognized by Ohio law, the corporate entity may be disregarded and a parent corporation and its subsidiary may be treated as a single entity, this is not one of those cases. *LeRoux's,* 602 N.E.2d at 687–88. A corporate structure may be disregarded, and the parent held liable for the actions of a

subsidiary, when a party can show that the parent and subsidiary are "fundamentally indistinguishable." *Univ. Circle Research Ctr. Corp. v. Galbreath Co.*, 106 Ohio App.3d 835, 667 N.E.2d 445, 448–49 (1995).

This case, of course, does not fit into that framework, as Tremco, and not an outside party, is asking us to disregard its own corporate structure.[2] Our research, however, has revealed no Ohio cases in which a corporate structure was disregarded under similar circumstances, and we find no warrant in Ohio law for crafting a completely new exception to Ohio's general rule that corporations and subsidiaries are separate entities. We conclude, therefore, that WTI and Tremco are separate entities as a matter of law. Because all agree that Baker competed directly only with WTI and not Tremco, he did not violate the noncompete clause of the Agreement. *See Russell v. Birmingham Oxygen Serv., Inc.*, 408 So.2d 90, 93 (Ala.1981) (concluding that parent company could not enforce noncompete clause where other party was competing solely against wholly-owned, but separately-incorporated, subsidiary). We reverse the trial court's grant of summary judgment in favor of Tremco and remand for entry of summary declaratory judgment in favor of Baker on this claim.

## II. Wrongful Discharge

Baker contends that the trial court erred both in denying his summary judgment motion on this claim and in granting Tremco's. Specifically, Baker argues that the designated evidence establishes that, while he resigned from Tremco "voluntarily," he was constructively discharged for refusing to commit an illegal act. The first point we must explore is whether Baker may even pursue a cause of action for wrongful termination under such circumstances.

## A. Wrongful Discharge in General

As a general rule, Indiana follows the doctrine of employment at will. *Wior v. Anchor Indus., Inc.*, 669 N.E.2d 172, 175 (Ind.1996). "If there is no definite or ascertainable term of employment, then the employment is at will, and is presumptively terminable at any time, with or without cause, by either party." *Tony v. Elkhart County*, 851 N.E.2d 1032, 1035 (Ind.Ct.App.2006) (citing *Coutee v. Lafayette Neighborhood Hous. Servs., Inc.*, 792 N.E.2d 907, 911 (Ind.Ct.App.2003)). "There are three exceptions to the employment at will doctrine, one of which is a public policy exception." *Id.* (citing *Coutee*, 792 N.E.2d at 911 (listing the three exceptions to employment at will doctrine)).

The public policy exception recognizes that, in some circumstances, it advances public policy to allow a cause of action to a person who was discharged and was first established by the Indiana Supreme Court in *Frampton v. Cent. Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973). The *Frampton* Court recognized that the worker's compensation statute created a public policy in favor of an employee filing a worker's compensation claim. *Id.* at 252, 297 N.E.2d at 427–428. As such, "[r]etaliatory discharge for filing a workmen's compensation claim is a wrongful, unconscionable act and should be actionable in a court of law." *Id.* at 252, 297 N.E.2d at 428. In *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 392–93 (Ind.1988), the Indiana Supreme Court expanded the public policy exception to include situations where an employer discharges an employee for refusing to commit an illegal act for which the employee would be personally liable.

---

**2.** One is left to wonder if Tremco's position would be the same on this question if Baker had directly sued WTI and had attempted to have Tremco held liable for its actions.

It is this second wrongful discharge context into which Baker contends he fits.

### B. Constructive Discharge

As previously mentioned, Baker resigned from Tremco, but contends that the designated evidence establishes that he was essentially forced to resign by Tremco, rendering his resignation a constructive discharge. "A constructive discharge occurs when an employer purposefully creates working conditions, which are so intolerable that an employee has no other option but to resign." *Cripe, Inc. v. Clark*, 834 N.E.2d 731, 735 (Ind.Ct. App.2005) (citing *Haubry v. Snow*, 106 Wash.App. 666, 31 P.3d 1186, 1192–93 (2001)). The constructive discharge doctrine "transforms what is ostensibly a resignation into a firing[.]" *Id.* "Before the employment situation will be deemed intolerable, however, the adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' of negative treatment." *Id.* (citing *Haubry*, 31 P.3d at 1192–93). "[T]he standard by which a constructive discharge is generally determined is an objective one: 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.'" *Id.* at 736–37 (quoting *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal. Rptr.2d 223, 876 P.2d 1022, 1027 (1994), *overruled on other grounds, Romano v. Rockwell Int'l, Inc.*, 14 Cal.4th 479, 59 Cal.Rptr.2d 20, 926 P.2d 1114 (1996)). The next question, then, is whether the doctrines of wrongful and constructive discharge can be applied together under Indiana law.

### C. Interaction of Wrongful Discharge and Constructive Discharge

Baker contends that, in the context of his wrongful discharge claim, he may use the constructive discharge doctrine to offset the fact that he was not, in fact, discharged from Tremco, but resigned. Tremco contends that allowing such would amount to the creation of a further exception to the employment at will doctrine, one that is not supported by Indiana law. As it happens, both sides have authority supporting their respective positions. In *Tony*, 851 N.E.2d at 1039, this court endorsed the use of the constructive discharge doctrine in the context of a retaliatory discharge claim. On the other hand, less than a year earlier, in *Cripe*, 834 N.E.2d at 735, this court expressed concern that "were we to apply the doctrine of constructive discharge to demonstrate a retaliatory discharge, we would be overly extending that which was intended by the narrowly-defined exceptions [to the employment at will doctrine]."

While acknowledging that exceptions to the employment at will doctrine are to be narrowly construed, *see, e.g., McClanahan*, 517 N.E.2d at 393, today we adopt the approach of the *Tony* court and endorse the application of the constructive discharge doctrine in this context. In our view, such an application does not represent a new exception to the employment at will doctrine, but, rather, is merely the application of two established doctrines in conjunction with one another within the contours of the extant exceptions. As previously mentioned, certain types of discharges can give rise to causes of action pursuant to the public policy exception to the employment at will doctrine. Also as previously mentioned, the doctrine of constructive discharge, under certain circumstances, legally transforms a resignation into a *de facto* discharge. So, it is not the public policy exception that has expanded, but, rather, the definition of discharge. While it may well be that application of the two doctrines in conjunction will increase

the total number of cases brought in this area, it is not because such application represents a new exception to the employment at will doctrine or expands an existing one.

Moreover, we believe that logic and sound policy considerations support our conclusion. We agree with Judge Robb's observation that "declining to adopt the constructive discharge doctrine [in this context would] ignore [ ] the fact that some employee resignations are involuntary [and] allow [ ] employers who wrongfully force an employee to resign to escape any sort of liability for their actions." *Tony,* 851 N.E.2d at 1038 (citing *Cripe,* 834 N.E.2d at 737 (Robb, J., dissenting)). We believe it makes little sense to allow an employer to accomplish constructively what the law will not allow it to do directly. *See N.L.R.B. v. Holly Bra of Calif., Inc.,* 405 F.2d 870, 872 (9th Cir.1969) ("An employer cannot do constructively what the act prohibits his doing directly, and causing working conditions to become intolerable as a means of terminating employment is forbidden conduct.") (citation omitted).

■ Finally, we are again in agreement with Judge Robb, who observed that

a constructive discharge has the potential to be far more egregious than an express discharge. With an express discharge, the employee is wronged in that he is fired without good cause. In a constructive discharge, although the employee is not fired, his employer may subject him to multiple abuses in an effort to make working conditions so intolerable that the employee is left with no choice but to resign.

*Cripe,* 834 N.E.2d at 737–38 (Robb, J., dissenting). Disallowing the application of constructive discharge in this context would encourage employers to protractedly abuse employees that they wished to wrongfully discharge and thereby avoid liability. For the above reasons, we conclude that a claim for wrongful discharge will lie even where the discharge in question was constructive.

### D. Baker's Claim

■ Baker has designated evidence that he left Tremco's employ due to a "hostile environment and Tremco's demands that [he] engage in unlawful conduct[.]" Appellants' App. p. 233. Specifically, Baker contends that Tremco was charging some public schools for materials and services that were never provided and overcharging them for materials and services that were provided. We conclude that Baker's designated evidence, even if true, does not create a genuine question of material fact regarding constructive discharge. As previously mentioned, the question in such cases is " 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " *Cripe,* 834 N.E.2d at 735 (quoting *Turner,* 32 Cal. Rptr.2d 223, 876 P.2d at 1027). Even if Baker had been pressured into engaging in unlawful conduct and had watched his company defraud some of its customers, reasonable alternatives to quitting remained open to him. For example, while Baker could have first contacted the authorities or superiors within Tremco regarding the alleged illegal conduct, there is no designated evidence that he did. It is worth noting that either of those two options was more likely to put a halt to any illegal activity than simply quitting. While we recognize today that a claim may be brought based on constructive wrongful discharge, Baker has failed to designate evidence creating a genuine issue of material fact on that question. We therefore affirm the trial court's grant of summary

judgment to Tremco on Baker's wrongful discharge claim.

## III. Defamation

▆▆▆▆ Baker contends that he designated evidence that Gibson defamed him when he allegedly told a third party after Baker left Tremco that he "suffers from mental illness and had engaged in inappropriate sales practices." Appellants' App. p. 349. A defamatory communication is one that "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *trans. denied.* "Whether [a communication] is defamatory 'depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place.'" *Journal–Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 n. 6 (Ind. 1999) (citations omitted). In order to maintain an action for defamation, the plaintiff must demonstrate (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Id.* "Whether a communication is defamatory or not is a question of law for the court, unless the communication is susceptible to either a defamatory or nondefamatory interpretation-in which case the matter may be submitted to the jury." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind.2007) (citation omitted).

### A. Libel and Slander

▆▆▆▆ "Defamation is an invasion of the interest in reputation and good name and is made up of the twin torts of libel and slander." *Gibson v. Kincaid*, 140 Ind. App. 186, 200, 221 N.E.2d 834, 842 (1966) (Faulconer, J., concurring in result). "'False defamatory words, if written and published, constitute a libel; if spoken, a slander.'" *Branaman v. Hinkle*, 137 Ind. 496, 502, 37 N.E. 546, 548 (1894) (citation omitted). Although this common law distinction between written and spoken communications has been criticized for decades, *see Gibson*, 140 Ind.App. at 200, 221 N.E.2d at 842 (Faulconer, J., concurring in result), our research has discovered no Indiana case discarding it. Indeed, in 2007, the Indiana Supreme Court cited with favor this court's 1992 *Rambo* decision, which explicitly preserved the distinction. *See Kelley*, 865 N.E.2d 593, 596–97 (citing *Rambo*, 587 N.E.2d at 145–46).

As a general rule, defamation by libel has given rise to liability more readily than does defamation by slander, which, due to its transitory nature, is considered less harmful. As the Indiana Supreme Court noted in *Gabe v. McGinnis*, 68 Ind. 538, 544 (1879):

> As to those libels which, by holding a person up to scorn or ridicule, and, still more, to any stronger feeling of contempt or execration, impair him in the enjoyment of general society, and injure those imperfect rights of friendly intercourse and mutual benevolence, which man has with respect to man, it is chiefly in this branch of libels that the action for words spoken, and for words written, substantially differ. The common law, in respect to our natural passions, gives no action for mere defamatory words, which he considers as transitory abuse, and not having substance and body enough to constitute an injury, by affecting the reputation. It confines, therefore, the action for slander to such of the grosser kind of words as impute positive crimes, or by charging a man with contagious disorders, tend to expel him

from society, and to words which injure him in his profession and calling. (Citation omitted).

## B. Defamation *Per Se* or *Per Quod*

 Defamation may further be characterized as *per se* or *per quod,* distinctions that have different meanings whether the context is libel or slander. "In the case of slander, a communication is defamatory *per se* under well-settled common law rulings if it imputes: 1) criminal conduct; 2) a loathsome disease; 3) misconduct in a person's trade, profession, office, or occupation, or; 4) sexual misconduct." *Rambo,* 587 N.E.2d at 145 (citations omitted). In libel, a communication is defamatory *per se* if its defamatory nature is clear without consideration of extrinsic facts. *Jacobs v. City of Columbus By and Through the Police Dep't,* 454 N.E.2d 1253, 1264 (Ind.Ct.App.1983).[3]

 The practical effect of the *per se/per quod* distinction is in the manner of pleading and proving damages. In the case of defamation *per se,* "[t]he law presumes the plaintiff's reputation has been damaged, and the jury may award a substantial sum for this presumed harm, even without proof of actual harm." *Rambo,* 587 N.E.2d at 145 (citations omitted). "In addition, the plaintiff, upon proper proof, is entitled to special damages, *i.e.,* damages, generally pecuniary in nature, which are consequential to the defamation." *Id.* at 145–46.

This court has explained the distinction between presumed, or general, damages and special damages as follows:

> In a defamation action, there are generally two classes of compensatory damages. The first is general damages, in-

---

**3.** This dual meaning of *per se* in the context of defamation seems to be a holdover from past pleading practices.

> In common law pleading, the right to recover general damages meant that the portion of the writ employed for institution of the suit devoted to specification of damage, and introduced by the words 'per quod,' became inapplicable whenever damages were presumed. To fill the void, and to signify that something had not been overlooked, the draftsmen in such cases would simply insert 'per se' where the allegations of damages, headed by the phrase 'per quod' otherwise would be expected.
>
> Since allegations of special damages were still required for those instances of oral defamation which did not fall in one of the four categories, such slander was referred to as slander 'per quod'; slander in any of the four categories was expectably then called slander 'per se'.
>
> As courts began to distinguish between written defamation which was libelous on its face and that which was libelous only upon proof of extrinsic circumstances, some referred to the former as libel per se and to the latter as libel per quod. Thus, in the context of libel, per quod came to mean defamation requiring proof of extrinsic cir-

cumstances. As a result, per quod acquired two meanings in the law of defamation: (1) when used in the frame of reference of slander it meant proof of special damages was required; (2) when used in the frame of reference of libel it meant that proof of extrinsic circumstances was required. With respect to libel the former meaning has been engrafted on the latter with the result that libel per quod requires proof of both extrinsic circumstances and special damages. This is not so with regard to slander. When the terms per se or per quod were used to describe a slanderous publication, there was no connection whatever with the question of whether the insulting words were clearly defamatory. If words had an innocent or ambiguous meaning, and so required allegations of extrinsic facts to show that a defamatory connotation was intended and understood, once sufficient allegations of that nature were made the slander was 'per se' if within one of the four categories, 'per quod' if it was not.

*Gen. Motors Corp. v. Piskor,* 27 Md.App. 95, 340 A.2d 767, 783 (1975), *affirmed in part and reversed in part on other grounds,* 277 Md. 165, 352 A.2d 810 (1976) (citations and quotation marks omitted).

jury to the plaintiff's reputation, and standing in the community, personal humiliation, and mental anguish and suffering, which damages the law presumes to be the natural, proximate and necessary result of publication. The second class is special damages, pecuniary in nature, which damages are not assumed to be necessary or inevitable but must be shown by allegation and specific proof to have been actually incurred as a natural and proximate consequence of the wrongful act.

*Stanley v. Kelley*, 422 N.E.2d 663, 668–69 (Ind.Ct.App.1981).

### C. The Interaction Between Libel/Slander and *Per Se/Per Quod*

To summarize, defamatory communications fall into one of four categories: *per se* slander, *per quod* slander, *per se* libel, and *per quod* libel. Judge Faulconer of this court succinctly described the effect of these distinctions, describing first the types of defamatory communications that do not require the pleading or proof of special damages:

> (1) Words, whether they be in the form of libel or slander, which are [either clearly defamatory or require extrinsic evidence to illustrate defamatory meaning], which (a) impute to another the commission of an indictable offense punishable by imprisonment; (b) impute to another a loathsome disease; (c) tend to injure another in his office, profession, trade, business or calling; or (d) impute unchastity to a woman.
>
> (2) Words in the form of libel which, on their face, without resort to extrinsic

facts or circumstances, that is to say, "*per se*," [4] tend to degrade another person, impeach his honesty, integrity, or reputation, or bring him into contempt, hatred, ridicule, or causes him to be shunned or avoided.

> All other words, in the form of slander, which cannot be fitted into the above categories designated (a) through (d) are actionable only upon allegation and proof of special damage or harm.

*Gibson*, 140 Ind.App. at 201, 221 N.E.2d at 843 (Faulconer, J., concurring in result).

### D. Baker's Claim

Baker has designated evidence that Gibson told a third party that Baker suffers from mental illness and had engaged in inappropriate sales practices. The threshold question is whether these alleged slanders, which both parties agree occurred, fall into one of the four categories that are considered to be *per se* defamatory slander.

#### 1. Mental Illness

We are not prepared to say that a statement that one suffers from mental illness, without more, is *per se* slanderous. As the Indiana Supreme Court explained in *Nichols v. Guy*, 2 Ind. 82, 83 (1850), the ground for providing one with a cause of action stemming from an accusation of suffering a loathsome disease "is the presumption that the party charged will be wholly or partially excluded from society by reason of the charge." In *Nichols*, the plaintiff contended that the defendant had told a third party that he had a sexually-transmitted disease, a charge that the Court found to be slander *per se*. *Id.* at

---

**4.** On the *www.westlaw.com* database and in West Publishing's printed Northeastern Reporter, the comma after "per se" is printed outside the quotation mark, while it appears inside in the Indiana Appellate Reports. Moreover, the phrase and all associated punctuation is italicized in the official reporter and in the printed Northeastern Reporter, but is *not* italicized on *www.westlaw.com*. Although the differences do not seem to alter the meaning of the cited passage, we will continue to use caution in citing to non-official sources.

82. The Court also noted that to charge a person wrongly with having the plague or leprosy is actionable without proof of special damage. *Id.* at 83.

We conclude that a charge that one has mental illness, without more, does not amount to a charge of having a loathsome disease. First, such a charge is far too vague to lead to a presumption that the subject will be excluded from society, not unlike a charge that one is "sick." Second, mental illness, even its most severe forms, in our view, shares little with other diseases, all of them physical ailments, that have been found to be loathsome. Unlike the diseases mentioned by the *Nichols* Court, mental illness is not communicable. Unlike physical diseases like leprosy or the plague, mental illness does not have the physical symptoms which generally evoke the public's aversion. Unlike venereal diseases, mental illness is not contracted through what many will assume was imprudent sexual activity nor does it implicate the affected person's moral turpitude. While some extreme forms of mental illness may cause exclusion from society, we do not have a specific charge that Baker is suffering from any of them, or, for that matter, *any* specific form of mental disease. We conclude that a bare charge of mental illness falls far short of a charge that one has a loathsome disease. As such, Baker's claim in this regard is slander *per quod,* and he was required to plead special damages. Baker, however, has admitted that he had not suffered any damages as a result of the statement that he was mentally ill, and his claim in this regard must therefore fail. The trial court properly entered summary judgment in favor of Gibson on this claim of defamation.

### 2. Inappropriate Sales Practices

On the other hand, we conclude that a charge that one engaged in "inappropriate sales practices" is a clear accusation of misconduct in one's profession and so constitutes a charge of slander *per se.* The statement is a direct reference to the manner in which Baker performed his profession when he worked with Tremco and clearly implies misconduct of some kind, be it misrepresentation, overcharging, or something else. While "inappropriate" behavior may not necessarily be illegal, we do not believe that the bar should be set so high in this context. If it were, of course, such a rule would render this whole category of slander *per se* superfluous, as it is already slander *per se* to accuse a person of committing a crime. Gibson's alleged charge that Baker engaged in inappropriate sales practices is slanderous *per se,* and Baker is therefore relieved of having to plead or prove special damages. On this charge of defamation, we reverse the trial court's grant of summary judgment in favor of Gibson and remand for trial on the issues of malicious intent, general damages, and special damages, if any.

### IV. Tortious Interference

Baker contends that the trial court erred in entering summary judgment in favor of Tremco on his claim of tortious interference, arguing that designated evidence created a genuine issue of material fact with regard to damages. The elements of tortious interference with a business relationship are (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship. *AutoXchange. com, Inc. v. Dreyer and Reinbold, Inc.,* 816 N.E.2d 40, 51 (Ind. Ct.App.2004).

The only point of contention between Baker and Tremco is whether Baker designated sufficient evidence to create a genuine issue of material fact with regard to damages. When asked during a deposition, "[Have] there been any particular damages that you've sustained as a result of any of the conduct that you've attributed to Tremco or its employees?", Baker replied, "Sure. I think I haven't gotten business because of it." Appellants' App. pp. 555–56. Baker also testified that he had a "great relationship going" with the Duneland School Corporation that ended when a representative of Duneland called and told Baker that "due to some issues with his superiors and things going on with [Baker's] history at Tremco, we're not going to be doing business with your organization." Appellants' App. p. 556. Baker testified that a representative of the DeKalb Central United School Corporation told him something similar when declining to do business with Moisture Management. Drawing all reasonable inferences from the designated evidence in favor of Baker, we conclude that he has designated evidence that creates a genuine issue of material fact regarding whether he was damaged by Tremco's alleged tortious interference. Tremco points out that Baker admitted that his lost business could have had nothing to do with any interference from Tremco, but this does not negate the designated evidence that Baker did, in fact, lose business as a result of Tremco's interference. The trial court erred in granting summary judgment in favor of Tremco, and we remand for trial on Baker's tortious interference with a business relationship claim.

### V. Blacklisting Statute

Baker contends that the trial court erred in granting summary judgment in favor of Tremco regarding his claim that it had violated Indiana's "blacklisting" statute, which provides as follows:

If any railway company or any other company, partnership, limited liability company, or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

Ind.Code § 22–5–3–2 (2004).

■ Tremco argues that *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 817 (Ind.Ct.App.2000), controls, in which the court strongly suggested that Indiana Code section 22–5–3–2 would not apply in a case where a former employer has attempted to enforce a noncompete clause against the former employee working for a new employer. *Id.* at 818. We agree with the *Burk* court on this point, and today explicitly hold that Indiana Code section 22–5–3–2 does not apply in such contexts. By the statute's plain language, a former employer may not attempt to prevent a former employee from "obtaining employment[.]" *Id.* Baker, however, alleges merely that he may have lost some business while working for Moisture Management, not that he was prevented from obtaining employment altogether. As such, the trial court properly entered summary judgment in favor of Tremco on Baker's "blacklisting" claim.

### Conclusion

In summary, we affirm the trial court's entry of summary judgment in favor of Gibson on Baker's claim that Gibson defamed him by telling a third party that he

suffered from mental illness and in favor of Tremco on Baker's "blacklisting" and wrongful discharge claims. Moreover, we reverse and remand with instructions to enter summary judgment in favor of Baker on his claim that he did not violate the noncompete clause of the Agreement. Finally, we remand for trial on Baker's claim against Tremco of tortious interference and his claim that Gibson defamed him by telling a third party that he had engaged in inappropriate sales practices. Trial on the defamation claim is limited to the issues of Gibson's malicious intent, general damages, and special damages, if any.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

BARNES, J., concurs.

CRONE, J., concurring in part and dissenting in part.

CRONE, Judge, concurring in part and dissenting in part.

I concur in the majority's opinion in all respects except for its affirmance of the trial court's entry of summary judgment in favor of Gibson on Baker's claim that Gibson defamed him by telling a third party that he suffered from mental illness. Because I believe that a bare assertion that someone suffers from mental illness is sufficient to constitute slander per se, I respectfully dissent as to that issue.

In its scholarly analysis of defamation jurisprudence, the majority notes that "[a] defamatory communication is one that 'tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with that person.'" Op. at 82 (quoting *Rambo*, 587 N.E.2d at 145). The majority further observes that "'[w]hether [a communication] is defamatory "depends, among other factors, upon

the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place."'" *Id.* at 82 (quoting *Journal–Gazette Co.*, 712 N.E.2d at 451 n. 6). Then, in discussing the four categories of per se slander, the majority states that "the ground for providing one with a cause of action stemming from an accusation of suffering a loathsome disease 'is the presumption that the party charged will be wholly or partially excluded from society by reason of the charge.'" *Id.* at 84 (quoting *Nichols*, 2 Ind. at 83).

As much as we might wish matters to be otherwise, persons suffering from mental illness have long been "excluded" from our society. Students of history will remember that in 1972, Missouri Senator Thomas Eagleton withdrew as the Democratic vice-presidential candidate after it was revealed that he had been hospitalized three times for "nervous exhaustion" during the 1960s and had received "electric-shock therapy for depression" on two of those occasions. Time.com, *McGovern's First Crisis: The Eagleton Affair* (Aug. 7, 1972), *available at* http://www.time.com/time/magazine/article/0,9171,879139-2,00.html. Nearly four decades later, I find it telling that the National Institute of Mental Health maintains a Stigma and Health Disparities Program, which "is concerned with mental illness stigma and discrimination and mental health disparities" and "supports research to understand better the processes underlying stigma and discrimination; to develop effective strategies and approaches for reducing stigma and discrimination; and to examine media influences on attitudes about mental illness and its treatment." National Institute of Mental Health, Stigma and Health Disparities Program, http://www.nimh.nih.gov/about/organization/

dahbr/health-and-behavior-research-branch/stigma-and-health-disparities-program.shtml (last visited June 16, 2008).[5] Closer to home, an Indiana government website proclaims as a "fact" that "consumers" of the Family and Social Services Administration's Division of Mental Health and Addiction "have multiple barriers to overcome when living in communities including: stigma associated with their illness, lack of income or a job, lack of appropriate health care, and a lack of housing." Indiana Family & Social Services Administration, Division of Mental Health and Addiction, Office of Consumer & Family Affairs, http://www.in.gov/fssa/dmha/4339.htm (last visited June 16, 2008).

In my view, the fact that mental illness is not communicable does not make it inherently less "loathsome" in the slander context than a physical disease such as leprosy[6] or syphilis. It is true, as the majority suggests, that mental illness has many forms and varying levels of severity, and it is precisely for this reason that I believe a "bare charge of mental illness" constitutes slander per se. Op. at 85. The clear and unmistakable import of such an accusation is that the affected person is unstable and untrustworthy and deserves to be excluded from society. Consequent-ly, I would reverse and remand with instructions to enter summary judgment in favor of Baker on this defamation claim.

**5.** In a similar vein, the U.S. Department of Health and Human Services' Substance Abuse and Mental Health Services Administration operates the Resource Center to Promote Acceptance, Dignity and Social Inclusion Associated with Mental Health, which "provides information and advice on countering discrimination and stigma associated with mental illness." Resource Center to Promote Acceptance, Dignity and Social Inclusion, http://www.stopstigma.samhsa.gov/main/aboutus.aspx (last visited June 16, 2008). Many nongovernmental organizations, such as Mental Health America (formerly known as the National Mental Health Association), also provide information and advice regarding the stigma associated with mental illness.

**6.** According to McGill University's Centre for the Study of Host Resistance,
> Research conducted over 100 years has strongly suggested that genetic factors participate in host susceptibility to leprosy. Work at our Centre by the group of E. Schurr has shed new light on the genetic component of leprosy susceptibility and identified the *NRAMP1* gene as an important genetic control element of leprosy susceptibility.

McGill University, Centre for the Study of Host Resistance, Diseases Studied, Leprosy, http://www.mcgill.ca/hostres/diseases/leprosy (last visited June 16, 2008). As with mental illness, the basis for the social stigma associated with leprosy is scientifically questionable at best.